Revised August 21, 2000

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————————

No. 99-30277

———————————

DONNA KENNEDY,

Plaintiff-Appellant,

v.

TANGIPAHOA PARISH LIBRARY BOARD OF CONTROL;
PAT SLEDGE, Director of the Tangipahoa
Parish Library System,

Defendants-Appellees.

————————————————————————

Appeal from the United States District Court
for the Eastern District of Louisiana

————————————————————————

August 15, 2000

Before BARKSDALE, BENAVIDES and STEWART, Circuit Judges.

BENAVIDES, Circuit Judge:

Appellant Donna Kennedy ("Kennedy") appeals from the district court's dismissal of her First Amendment cause of action for failure to state a claim, or, in the alternative, for summary judgment. Because we find that Kennedy has stated a claim and created a genuine issue of material fact precluding summary judgment, we reverse and remand.

## I.    Factual and Procedural Background

Kennedy began working at the Tangipahoa Parish Library ("the Library") on March 21, 1995.  By all objective criteria, she performed her job well.  Over the course of two years, she received five promotions with commensurate pay raises.  At the time the Library terminated her, Kennedy served in two managerial positions, Automation Coordinator and Technical Services Supervisor.  In Kennedy's June 1997 evaluation, her last before being fired, appellee Pat Sledge ("Sledge"), the Library's director, rated Kennedy's performance overall as "excellent."

The events leading to Kennedy's termination commenced on October 15, 1997.  On that day, Virginia Patanella ("Patanella") and her supervisor, branch manager Sannie Bonfiglio ("Bonfiglio), were working at the Independence branch of the Library.  Around 1:00 pm, Bonfiglio called the Library's administrative offices to ask that a replacement worker be sent to the Independence branch; Bonfiglio was departing work early to prepare for her daughter's wedding that evening.  The person to whom Bonfiglio spoke in the administrative offices apparently told Bonfiglio to stay at work because she only had a few hours left.  But at 3:15, Bonfiglio again called the administrative offices and reported that she was going home.  No one arrived to replace Bonfiglio, so Patanella continued working alone.

At 4:00 pm, Archie Dean Forsythe ("Forsythe"), an apparently

homeless man with a criminal record and a history of mental illness, entered the Independence branch.  Finding no patrons in the library, Forsythe raped Patanella, threatened to kill her, and severely beat her about her head, fracturing several bones in her face.  A patron entering the library during the rape summoned an off-duty police officer, Sergeant R.J. Guarena, Jr. ("Sergeant Guarena"), who was grocery shopping across the street.  Sergeant Guarena confronted Forsythe while he was pulling up his pants.  A struggle ensued and Guarena succeeded in apprehending Forsythe.

The crime, its brutal nature, the dramatic apprehension of Forsythe, and the lack of security at any of the Library's branches left the community in an uproar.  By the appellee's own admission, the crime sparked intense media scrutiny and gossip.  Responding to these community pressures, the Tangipahoa Parish Council ("Council") sent a letter to Sledge on October 16, 1997, the day after the crime; the letter requested that Sledge detail how she planned to prevent such occurrences in the future.

On October 17, 1997, Kennedy visited Patanella in the hospital.  Having been told that Patanella was fine except for some bruises, Kennedy was unprepared for Patanella's true condition.[1]  Moved, Kennedy spoke to Patanella about the rape,

---

[1]     One newspaper described Patanella's appearance on Friday, October 17, as follows: "Her face [had] . . . two deep purple/pink bruises where eyes should be.  Her eyes had just barely slit open a little that morning for the first time since the attack, she said.  She had stitches on the side of her head, and her hair was stiff with dried blood."  Gloria Lupo, I'm Going

and Patanella confessed that her main concern was that others not suffer the same fate.[2]

On her way home from the hospital, Kennedy stopped at the Ponchatoula branch, where, upon her arrival, branch manager Lenore Johnson ("Johnson") was hanging up the phone after talking with Sledge.  Johnson confided to Kennedy that Sledge had requested help with "damage control" regarding Patanella's rape. As Sledge was ultimately responsible for maintaining the employment of both Bonfiglio, the branch manager who left early in the day with only two hours notice, and the administrative offices' employee who failed to dispatch a replacement for Bonfiglio, Sledge understandably wanted aid in dealing with the fallout.  Moreover, Sledge was hoping that the appellee Tangipahoa Parish Library Board of Control ("the Board of Control" or "the Board") would soon approve spending for a building to house the Hammond branch of the Library, and the rape obviously had the potential to jeopardize those plans.[3]

Kennedy became extremely concerned after speaking with

_____

to Kill You, Says the Attacker, The Amite Tangi Digest, Oct. 22, 1997, at 1.

[2]    Indeed, Patanella said the same thing in The Amite Tangi Digest article.  Id. at 1 ("I don't want it to happen to anyone else.  I hope no one will have to be left alone in the libraries again.").

[3]    The Board did in fact approve the resolution to purchase a building for the Hammond branch on November 7, 1997. See Sharyn C. Brecheen, Parish Library Wants to Buy Permanent Home for Hammond Branch, The Amite Tangi Digest, Nov. 12, 1997.

Johnson.  Kennedy had observed in the past that Sledge had downplayed any events that cast the library in a negative light, and Kennedy feared that de-emphasizing Patanella's rape could have terrible consequences.  On October 18, 1997, Kennedy wrote a letter.  She hoped that this letter would prompt Sledge and the Board to confront the risks occasioned by the lack of security at the Library branches.  In its salient parts, the letter stated:

> I would like to suggest to the Library Board and Administration a much needed change in the Tangipahoa Parish Library policy.
> Suggested Policy: There will be at least two library employees present at all times when the Library is open to the public.  No library employee (male or female) will be in an unlocked library building alone.  Also, two library employees must be present to close the library after it has been open to the public.
> . . . .
> I also venture to suggest, that if it is deemed that there is not enough circulation to support two employees at the Clark and Loranger branches, that these branches be closed and the employees transferred to other branches.
> Please note that this is not a knee-jerk reaction to this hideous crime.  Similar changes have been discussed, that I am aware of, due to the drinking and drug activities on the corner down from the Loranger Branch and the distasteful pranks, suspicious characters, and rude and harassing patrons at the Kentwood Branch.[4]
> It is my humble opinion that what happened at the Independence Branch on October 15, 1997 cannot be down played.  This event must be addressed and steps taken to prevent a similar act. . . .
> Now is the time for the Library Board and Administration to take a firm stand and address the question: Are we ready to show the Library employees

---

[4]    These references relate to an incident in which a patron sat in the Kentwood branch and stared at the librarians for hours on end.  Shortly thereafter, the librarians found a dead cat in their drop box.

5

and Tangipahoa Parish residents that we will do everything possible to protect the safety of our Library employees and our Library patrons?

Kennedy signed the letter in her capacity as Automation Coordinator and Technical Services Supervisor and enclosed a copy of part of the Library's Safety Program, which sets forth the Library's policy for dealing with investigations of accidents. Included within this section are the directives "ENCOURAGE people to give their ideas for preventing a similar accident," and "FOLLOW UP to make sure conditions are corrected."

Kennedy mailed the letter to the members of the Board of Control and the Library branch managers. She hand-delivered a copy of the letter to Patanella the day she wrote it.

The following Monday, October 20, 1997, Kennedy attended a meeting called by Sledge at the Amite branch. At the meeting, Sledge reprimanded those in attendance for personally attacking her. Specifically, Sledge singled out Anne Ellzey. Sledge then indicated that she had spoken with Patanella, and that Patanella primarily desired that the Library employees stop gossiping about the rape. Remembering Patanella's plea that no other librarians work alone, Kennedy ventured a comment that the situation was not about Sledge, but rather about Patanella and the safety of the patrons and employees at the Library.

After the meeting, Kennedy asked to speak with Sledge. Kennedy then showed Sledge the letter. Sledge perused it and remarked that it was well written. The encounter was

unremarkable, and Kennedy departed to complete her work for that day in the usual manner.

Sledge answered the Council's request for policy changes on October 20, 1997 with a 10-step plan designed to heighten security. Sledge's proposal included a provision insisting that two employees be present at any Library branch open to the public, though the record does not reveal whether Sledge incorporated Kennedy's idea or thought of it independently.

Three days later, on October 23, 1997, the Board of Control held a meeting. Security matters were not on the agenda, but Board member Howard G. Ridgel ("Ridgel") broached the topic. Board chairman Edward B. Dufreche attempted to postpone the issue, arguing that more time was necessary to examine all the options. Ridgel urged the Board members to confront the problem and mentioned that Kennedy's letter had also encouraged the Board not to gloss over the rape and the safety concerns it highlighted. The Board members then voted to address the security issue and adopted Sledge's 10-step plan at the meeting.[5]

That afternoon, Sledge penned a letter demoting Kennedy and

---

[5] A newspaper article detailing the October 23, 1997 Board of Control meeting reports that Ridgel mentioned Kennedy's letter. See Sylvia Schon, Libraries Take Safety Measures, Daily Star, Oct. 24, 1997, at 1. The article also quotes Kennedy telling the Board of Control, "I appreciate the fact that Buddy [Ridgel] brought this up. We're all wondering what's going to be happening. It's good to let the employees and the public know that you're talking about this and doing something about it." Id.

stripping her of all her supervisory duties.  Though Sledge and

the Board of Control concede that Sledge demoted Kennedy in

response to her letter, the announcement of this demotion

criticized Kennedy in general terms:

> It is with disappointment that I recognize and
> accept the fact that you and I no longer share the same
> vision of the future for the Tangipahoa Parish Library
> System.
> It has become apparent that you have assumed far
> too much authority for your position as Automation
> Coordinator and Technical Services Supervisor.  Your
> assigned role does not include discussing opening and
> closing of library branches, nor does include [sic]
> discussing with other employees what I, as the
> appointed Director, do correctly or, in you [sic]
> opinion, incorrectly.
> . . . .
> You [sic] job does not include discussion of
> personnel, the daily administration of this Library
> System nor meeting with business representatives[6] that
> are not directly concerned with your departments, nor
> writing derogative comments about local communities.

Rather than delivering the demotion letter to Kennedy

personally or at work, Sledge mailed the letter by certified mail

to three addresses in Kennedy's personnel file.  On October 30,

1997, fully a week after Sledge composed and sent the demotion

letter, Kennedy's father called Kennedy at work to tell her that

---

[6]     This is apparently a reference to an incident in which
a representative of a security company talked to Kennedy about
where he should place a cable.  As the location of cables for the
computer network was within Kennedy's authority as Technical
Services Supervisor, she was the correct Library representative
to answer the security company representative's questions.
Kennedy's conduct in this regard presented no problem to Sledge
until Kennedy mentioned at the October 23, 1997 Board of Control
meeting that she had spoken with a representative of the security
company.

he had declined to sign for a certified letter for her from the Library. On October 31, 1997, Kennedy, who was familiar with the Library's protocol of delivering bad news by certified mail, called Sledge to find out what the letter said. Sledge refused to speak with Kennedy on the phone, but Sledge allowed that she would send a copy of the demotion letter to Kennedy at work on November 3, 1997. Kennedy read the letter on November 3, and thereby became informed of her demotion, more than 10 days after its occurrence.

Sledge made an appointment for November 10, 1997 to speak with Kennedy about her job. Sledge's stated purposes for the meeting were to discuss the reasons for Kennedy's demotion and her new job responsibilities, to agree upon a lower wage, and to assess Kennedy's willingness to continue working at the library in a non-supervisory capacity. The meeting, however, never occurred. On November 10, 1997, Kennedy showed up for the meeting with a tape recorder and her father, whom she wanted along as a witness. Sledge, meanwhile, had asked Cindy Camp to join the meeting, unbeknownst to Kennedy. Sledge refused to permit Kennedy to record the meeting or to have her father present as a witness. Sledge then fired Kennedy.[7]

---

[7] The parties dispute the facts surrounding this meeting. Kennedy claims that Sledge planned to fire her on October 23, the date of the Board meeting. Kennedy surmises that Sledge demoted Kennedy because of the letter, waited two weeks as required by Library policy, and then fired her. Kennedy supports her inference with the fact that Sledge had prepared Kennedy's final

Kennedy filed a grievance with the personnel committee of the Library.  The Board of Control upheld the personnel committee's decision in favor of Sledge on February or March 17, 1997.  Kennedy then filed this present action on March 26, 1998.

During a hearing on December 2, 1998, the district court denied Kennedy's motion to amend her complaint and granted Sledge's motion to dismiss on grounds of qualified immunity.  Ignoring the court's order, Kennedy filed a first amended complaint on December 7, 1998.  The district court permitted the clerk of the court to place the first amended complaint in the record.

Sledge, who apparently was unsure of the significance of the first amended complaint, and the Board then moved to dismiss the first amended complaint for failure to state a claim, or, in the alternative, for summary judgment, which motion the district court granted, entering its final order on February 23, 1999.[8]

---

paycheck prior to the meeting.  Sledge, on the other hand, claims that when Kennedy indicated her desire to record the meeting, Sledge promptly fired her for insubordination.

[8] The record is in an unfortunate state that leaves unknown the true grounds for the district court's dismissal. Appellees styled their motion to dismiss as a motion to dismiss for failure to state a claim, or in the alternative, for summary judgment.  The district court stated its reasons for the dismissal from the bench during oral argument, but neither party requested that a court reporter make a record of oral argument. Moreover, the district court's judgment relates the grounds of dismissal only as being those set forth during oral argument.  As we lack any objective account of the district court's reasoning for the dismissal, we must conduct both Rule 12(b)(6) and Rule 56 analyses before we may properly reach our conclusion that the

## II.   Standard of Review

We apply de novo review to dispositive motions, like dismissals for failure to state a claim and grants of summary judgment.  See Lowrey v. Texas A & M Univ. Sys., 117 F.3d 242, 246 (5th Cir. 1997) (failure to state a claim); Shackelford v. Deloitte & Touche, LLP, 190 F.3d 398, 403 (5th Cir. 1999) (summary judgment).

A dismissal for failure to state a claim upon which relief can be granted is a disfavored means of disposing of a case.  See Shipp v. McMahon, 199 F.3d 256, 260 (5th Cir. 2000) (quoting Kaiser Aluminum & Chem. Sales v. Avondale Shipyards, 677 F.2d 1045, 1050 (5th Cir. 1982)).  District courts should avoid such dismissals "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  To ascertain whether a complaint states a claim, we must construe the complaint liberally in the plaintiff's favor and accept all factual allegations in the complaint as true.  See Shipp, 199 F.3d at 260 (citing Campbell v. Wells Fargo Bank, 781 F.2d 440, 442 (5th Cir. 1986)).

A grant of summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

---

district court's dismissal warrants reversal and remand for a trial on the merits.

11

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. Proc. 56(c); see also Christopher Village, LP v. Retsinas, 190 F.3d 310, 314 (5th Cir. 1999).  "An issue is genuine if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party."  Owsley v. San Antonio Indep. Sch. Dist., 187 F.3d 521, 523 (5th Cir. 1999).  "Although we consider the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the nonmovant, the nonmoving party may not rest on the mere allegations or denials of its pleadings, but must respond by setting forth specific facts indicating a genuine issue for trial."  Rushing v. Kansas City S. Ry. Co., 185 F.3d 496, 505 (5th Cir. 1999).

## III.    **Failure to State a Claim**

Kennedy argues that her amended complaint properly alleges that she spoke on a matter of public concern, and thus states a claim for retaliation in violation of the First Amendment.  To the extent that the district court did not consider her amended complaint because it denied her request to file one, Kennedy argues that the district court erred in not granting her permission to amend.  The Board counters that, regardless of whether the district court considered Kennedy's first amended complaint, her speech was private and not public, and therefore, Kennedy cannot state a claim.

12

An employee's First Amendment retaliation claim has four elements: (1) an adverse employment action; (2) speech involving a matter of public concern; (3) the employee's interest in speaking outweighs the employer's interest in efficiency; and (4) the speech must have precipitated the adverse employment action. See Teague v. City of Flower Mound, Texas, 179 F.3d 377, 380 (5th Cir. 1999).

The dispute here centers on the second element, that is, whether Kennedy's speech involved a matter of public concern.[9] Whether Kennedy spoke on a matter of public concern is a legal question, see Rankin v. McPherson, 483 U.S. 378, 386 n.9 (1987); Dodds v. Childers, 933 F.2d 271, 273 (5th Cir. 1991), and it is therefore suitable for resolution on appeal. We have used two tests, sometimes in conjunction with one another, to determine

---

[9] With respect to the other elements, Kennedy's demotion satisfies the first element because it indisputably constitutes an adverse employment action. See Harris v. Victoria Indep. Sch. Dist., 168 F.3d 216, 221 (5th Cir. 1999) ("[W]e have repeatedly held that . . . demotions constitute adverse employment decisions."). The third element, being the factually-sensitive balancing test that it is, implicates only the summary judgment, not failure to state a claim, analysis. As for the fourth element, appellees concede repeatedly throughout their pleadings that Sledge demoted Kennedy "[i]n response to th[e] letter[.]" Brief for Appees., at 3.

Appellees do argue that Kennedy's demotion is irrelevant because they claim that Sledge ultimately terminated Kennedy for insubordination, not her speech. But that issue is not relevant to the failure to state a claim analysis. The pertinent question for the Rule 12(b)(6) analysis is whether Kennedy has alleged an adverse employment action motivated by her speech, and the demotion satisfies that inquiry.

13

whether speech relates to a public concern; both tests derive from language in Connick v. Myers, 461 U.S. 138 (1983). The first is the content-form-context test: "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole court record." Id. at 147-48; see also Tompkins v. Vickers, 26 F.3d 603, 606 (5th Cir. 1994).

The second, "shorthand" test is the citizen-employee test: "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest," the employee's speech falls outside the parameters of speech involving matters of public concern. Connick, 461 U.S. at 147 (emphasis added); see also Schultea v. Wood, 27 F.3d 1112, 1120 (5th Cir. 1994), superseded on other grounds by, 47 F.3d 1427 (5th Cir. 1995) (en banc). The citizen-employee test can yield indeterminate results because "[t]he existence of an element of personal interest on the part of an employee in the speech does not prevent finding that the speech as a whole raises issues of public concern." Dodds, 933 F.2d at 273. Thus, "[i]n cases involving mixed speech, we are bound to consider the Connick factors of content, context, and form, and determine whether the speech is public or private based on these factors." Teague, 179 F.3d at 382.

14

This is a "mixed speech" case.[10]  Kennedy spoke in her letter in her capacity as a citizen: a fear that Sledge and the Board were placing the public and Library employees, other than herself, in danger by downplaying the seriousness of the rape prompted her speech.  Moreover, she spoke as an informed citizen on a topic that dominated the local media and against a background of vigorous public debate.  But Kennedy also undoubtedly spoke as an employee: she signed the letter in her supervisory capacity, and she believed that speaking out about employee safety was part of her job as a supervisor and employee.

Mixed speech cases are perhaps the most difficult subset of employee speech cases to adjudicate.  Because the employee admittedly speaks from multiple motives, determining whether she speaks as a citizen or employee requires a precise and factually-sensitive determination.  We therefore embark upon an overview of

---

[10]  In their supplemental motion on appeal, appellees cite Gerhart v. Hayes, 201 F.3d 646, 650 (5th Cir. 2000) for the proposition that "speech made in the role as employee is of public concern only in limited cases:  those involving the report of corruption or wrongdoing to higher authorities." (emphasis added).  The appellees' argument must fail.  In response to Gerhart's motion for panel rehearing, however, the panel deleted that language and decided instead to base its First Amendment outcome not upon the public or private nature of Gerhart's speech, but rather upon the lack of causation between her speech and her termination and the fact that she could not prove that she would not have been terminated anyway, regardless of her speech.  See Gerhart, 201 F.3d 646, rev'd on reh'g, 217 F.3d 320 (5th Cir. 2000).

the mixed speech cases[11] in this Circuit to aid us in our application of the content-form-context test. Our first mixed speech case was Gonzalez v. Benavides, 774 F.2d 1295 (5th Cir. 1985). Gonzalez was the executive director of a community action agency, which administered federal anti-poverty programs. After Gonzalez fired a subordinate, the County Commissioners' Court reinstated the subordinate, publicly reprimanded Gonzalez, and instituted an investigation into Gonzalez's job performance. Gonzalez responded publicly by declaring any investigation of his performance to violate the community action agency's regulations; privately, he objected that the Commissioner's Court failed to appeal first to the Administering Board, as required by the community action agency's regulations. He also denied that the Commissioner's Court possessed the authority to regulate his job performance. This latter assertion catalyzed Gonzalez's termination.

In evaluating the facts, the Gonzalez court concluded that, because "[p]ublic employees, by virtue of their public employment, may make valuable contributions to the public debate," id. at 1299, "we do not read Connick . . . to exclude the possibility that an issue of private concern to the employee may also be an issue of public concern." Id. at 1300-01.

---

[11] We include in this overview only those cases that use the term "mixed speech," and conduct a mixed speech analysis. We are cognizant, however, that other cases may exist to which the term "mixed speech" might arguably be applied.

Determining that Gonzalez "raised such a mixed issue," id. at 1301, the panel held that the speech at issue related to the public concern for three reasons.  First, whether the Commissioner's Court complied with agency regulations was, in and of itself, a matter of public concern.  Second, failure to so comply would lead to a withdrawal of federal funds, which also was a matter of public concern.  Finally, "the uncertain allocation of authority and responsibility among the County Court, the . . . Administering Board, the Executive Director, and the Deputy Director," id., related to the public concern because "this uncertainty generated friction and reduced the efficiency of the agency."  Id.  Therefore, Gonzalez spoke on a matter of public concern.

Subsequent to Gonzalez, we decided Terrell v. University of Texas Sys. Police, 792 F.2d 1360 (5th Cir. 1986).  In that case, the University of Texas police force initiated an internal investigation of Terrell, a Captain in the University of Texas police force.  In response, Terrell made remarks critical of his superior, Chief Price, in a diary.  After some pages of the diary appeared anonymously on Chief Price's desk, Chief Price fired Terrell.  After quoting Connick's language regarding speaking "'as an employee upon matters only of personal interest,'" id. at 1362 (quoting Connick, 461 U.S. at 147), the Terrell court restated our task in mixed speech cases as deciding "whether the speech at issue in a particular case was made primarily in the

17

plaintiff's role as citizen or primarily in his role as employee." Id. While a standard that requires employees to speak primarily as citizens is obviously far more stringent than one that asks only that employees speak on matters not solely of personal interest, Terrell's formulation has become a benchmark for mixed speech cases in this Circuit.[12] Terrell himself was unable to show that he spoke primarily as a citizen for three reasons. First, he neither aired his grievances to the public nor "would [he] have had any occasion to do so." Id. at 1363. Second, the investigation of Terrell was wholly intra-departmental, "undertaken without any intervention from [the] outside[.]" Id. And third, because of the intra-departmental nature of the investigation, and the fact that the investigation revealed that "Terrell himself was a leading cause of serious problems in the Houston Department," id., any criticisms that Terrell leveled at Chief Price were "'tied to a personal employment dispute.'" Id. (quoting Connick, 461 U.S. at 148 n.8).

Three years later, we again addressed mixed speech in Moore v. City of Kilgore, 877 F.2d 364 (5th Cir. 1989). There, Moore,

---

[12] But see Richard H. Hiers, First Amendment Speech Rights of Government Employees: Trends and Problems in Supreme Court and Fifth Circuit Decisions, 45 Sw. L.J. 741, 792 (1991) ("[Terrell's] reading of Connick conflicts with other Fifth Circuit holdings that public employee speech about both matters of public concern and other matters, in short, a mixed bag of concerns, would be protected." (citing Gonzalez, 774 F.2d at 1295, Thompson v. City of Starkville, Mississippi, 901 F.2d 456, 463-64 (5th Cir. 1990), and Brawner v. City of Richardson, 855 F.2d 187, 192 (5th Cir. 1988))).

18

who was president of the Kilgore Professional Firefighters Association, Local 2996, spoke to the media—against the orders of his superior, Chief Duckwork—about a tragic accident that left one firefighter dead and another one injured.  In his diatribe about the accident, Moore blamed the fire department's lean staffing policies for the death and injury, capping his remarks with, "I just want to say, 'I told you so.'"

The Moore court found Moore's speech to relate to the public concern.  It first observed, regarding the content of Moore's speech, that "[t]he public, naturally, cares deeply about the ability of its Fire Department to respond quickly and effectively to a fire."  Id. at 370.  The Moore court continued:

> While our analysis is grounded in significant part on the importance to the public of the content of Moore's speech, Moore, as a citizen, also has a significant interest in speaking his mind on matters of public concern that factors importantly into our analysis. The First Amendment accords all of us, as participants in a democratic process, room to speak about public issues.  The operation of the city Fire Department certainly is a matter that concerns interested citizens.  When Moore spoke about the fire on December 26, 1985, he spoke as an informed citizen regarding a matter of great public concern.

Id. at 371.

The Moore court then turned to the context analysis.  The district court had declared Moore's speech private because "the need for public debate on the staffing issue had passed" and because "[Moore's conduct] smacks of a disgruntled employee attempting to draw public attention to this job-related issue."

19

Id.  The Moore court rejected this assessment, emphasizing that "[t]he speech in our case is not linked to a personal employment dispute between Moore and the City," id. at 370 n.2, and that, based upon the media questions to which Moore responded, "the public was receptive and eager to hear about the ability of the Fire Department to perform its duties."  Id. at 371.

Concluding with the form analysis, the Moore court conceded that, while Moore's remarks "do involve a hint of 'employee' considerations . . . . mixed motivations are involved in most actions we perform everyday."  Id. at 371-72.  Viewing the speech as a whole, the panel found Moore's speech to relate to the public concern.

Our next foray into the realm of mixed speech was Thompson v. City of Starkville, Mississippi, 901 F.2d 456 (5th Cir. 1990). Thompson served as a police officer in Starkville's police department for eight years.  He claimed that two separate instances of speech caused his termination.  The first occurred in 1981, when he filed a written grievance protesting the promotions of certain police officers who had not satisfied department regulations regarding eligibility for promotion.  The second complaint consisted of oral reports revealing unethical conduct by police officers who had received promotions.  Thompson also aided his fellow police officers in filing similar grievances.

The Thompson court concluded that the content of Thompson's

speech was public.  Unlike Connick, where "[Myers']
questionnaire, if released to the public, would convey no
information at all other than the fact that a single employee is
upset with the status quo," 461 U.S. at 148, Thompson's
grievances, if revealed to the public, would expose wrongdoing by
members of the Starkville police department.  Thompson, 901 F.2d
at 463.

Likewise, the panel found the context and form of Thompson's
speech to be public.  The court deemed the private nature of
Thompson's communications not dispositive: "This alone, however,
does not necessitate a finding that his alleged speech was not
connected to matters of public concern."  Id.  "'The private
nature of the statement does not . . . vitiate the status of the
statement as addressing a matter of public concern.'"  Id. at 467
(quoting Rankin, 483 U.S. at 386-87 n.11).  "A holding to the
contrary would mean that loyal employees seeking to rectify
problems would lose constitutional protection for attempting to
correct problems inhouse.  Such a punitive result seems illogical
where procedures have been established to encourage internal
remedial actions."  Id.

Moreover, the fact that Thompson felt aggrieved by the
promotions of other, unqualified police officers did not preclude
First Amendment protection: "Circuit courts have also recognized
that an employee's speech may contain a mixture of public and
personal concerns."  Id. at 464.  In this regard, the court

21

observed that "Thompson stood to gain little personally through his grievance[.]" Id. at 465. "He did not seek back pay or promotion. Moreover, he aided others in filing similar complaints; these clearly did not redound to his own benefit." Id. at 466. Additionally, the nature of the wrongdoing he exposed—"which could potentially affect public safety," id. (footnote omitted)—distinguished Thompson's speech from that of Terrell, which "involve[d] a matter of purely intra-governmental concern." Id. Thompson's speech therefore fell within the scope of the First Amendment.

Wilson v. UT Health Ctr., 973 F.2d 1263 (5th Cir. 1992), was this Circuit's next pronouncement on the issue of mixed speech. Wilson, a sergeant with the UT Health Center's police force, reported a number of instances of sexual harassment-including one in which she had been the victim-to her supervisor, Chief Moore. After investigating the incidents, Chief Moore determined that Wilson had exaggerated or misrepresented the events comprising her claim of harassment. He therefore demoted, and then ultimately terminated, Wilson.

The Wilson court found that Wilson's speech related to the public concern. Regarding the content of her speech–allegations of sexual harassment-the court held that such reports, like accounts of race discrimination, see Givhan v. Western Line Consolidated Sch. Dist., 439 U.S. 410, 415-16 (1979), were of public concern and distinguished both Terrell and Connick on the

22

grounds that "the only reason that the public would be concerned about the speech there at issue was because it involved a public workplace."  Wilson, 973 F.2d at 1269.

In evaluating context, the Wilson court dismissed the defendants' argument that the private forum of Wilson's complaint stripped her speech of protection: "Nor did Wilson forfeit her right to speak by choosing an internal forum to speak as a citizen about sexual harassment within the UTHC police force." Id. at 1270.

The Wilson court likewise rejected the defendants' assertion that the form of the speech indicated a private nature because Wilson acknowledged some duty, as a police officer, to report sexual harassment.  Observing that "practically, such a rule would permit public employers to remove constitutional protection from speech on certain subjects by including those subjects within employees' reporting duties," id. at 1269, the Wilson court mused that "the rule proposed by the defendants could ironically facilitate the suppression of speech through a requirement that the speech be made."  Id.  Instead, the panel reiterated Connick's admonition that courts withhold First Amendment protection from speech on "matters only of personal interest," 461 U.S. at 157, and interpreted this "key statement . . . [to] mean that the [Supreme] Court removed from First Amendment protection only that speech that is made only as an employee, and left intact protection for speech that is made both

23

as an employee and a citizen." Id.[13]  Wilson's speech,

_____

        [13]    In Teague, 179 F.3d 377, a panel of this Circuit
criticized this language in Wilson.  To the extent that Wilson
implies that "federal review is proper in all mixed speech
cases," Teague, 179 F.3d at 382, the Teague court rejected its
import as "unworkable: The mere insertion of a scintilla of
speech regarding a matter of public concern would make a federal
case out of a wholly private matter fueled by private, non-public
interests."  Id.  Moreover, Teague argued that Wilson's standard
"would create a split among the circuits."  Id. at 383.  Finally,
the Teague court resorted to the "rule of orderliness" to
abrogate Wilson's implications: "to the extent that Wilson's
language contradicts the 'primary role'/balancing test of Terrell
(and Moore), decided years earlier, it is of no effect."  Id.
     We perceive reasonable rebuttals to Teague's criticisms.
First, regardless of Teague's judgment about the wisdom of
granting federal review to all mixed speech cases, that is what
the plain language of Connick demands: "when a public employee
speaks not as a citizen upon matters of public concern, but
instead as an employee upon matters only of personal interest,
[no First Amendment protection inheres.]"  461 U.S. at 147
(emphasis added).  Teague does not reconcile its criticism with
this language in Connick.
     Second, given that the case Teague cites as creating a
circuit split with Wilson, Hartman v. Board of Trustees, 4 F.3d
465 (7th Cir. 1993), was decided after Wilson, it is Hartman, not
Wilson, that creates the circuit split.  Even were this not the
case, Hartman also conflicts with law in the Sixth Circuit.
See Chappel v. Montgomery County Fire Protection Dist. No. 1, 131
F.3d 564, 574-76 (6th Cir. 1997).  In Chappel, the Sixth Circuit
rejected the defendant's argument that Chappel's speech was
private because his "predominant motivat[ion] [was] his self-
interest in obtaining a position as a paramedic with the
ambulance district."  Id. at 574.  The Chappel court observed
that the defendant's argument "is in direct conflict with the
Supreme Court's holding in Connick."  Id.  Moreover, it deemed
"the argument that an individual's personal motives for speaking
may dispositively determine whether that individual's speech
addresses a matter of public concern [to be] plainly illogical
and contrary to the broader purposes of the First Amendment."
Id.  Specifically, the Chappel court elucidated, as this Circuit
did in Moore, that speech on matters of public concern deserves
the protection because "the First Amendment is concerned not only
with a speaker's interest in speaking, but also with the public's
interest in receiving information."  Id.
     Finally, the rule of orderliness has little persuasive force
when the prior panel decision at issue conflicts with a Supreme

24

therefore, like Moore's, garnered First Amendment protection.

This Circuit again addressed the issue of mixed speech in Gillum v. City of Kerrville, 3 F.3d 117 (5th Cir. 1993). In that case, Gillum, a policeman with the Kerrville police department, investigated allegations that the police chief had smoked dope with a woman who had a criminal record. Gillum's supervisors held a meeting, at which they told Gillum that Internal Affairs would continue his investigation without his participation. Fearing that Internal Affairs would not conduct a neutral inquiry, Gillum surrendered his badge and gun, declaring "I won't compromise this badge." He then departed the station. When Gillum returned the next day to report for work, his supervisor told him that he had quit. Unable to obtain reinstatement, Gillum sued.

Without conducting an explicit content-context-form analysis, the Gillum court determined that Gillum's speech did not relate to the public concern. Citing Terrell, the panel emphasized that "[we] focus on the hat worn by the employee when speaking rather than upon the 'importance' of the issue [to] reflect[] the reality that at some level of generality almost all speech of state employees is of public concern[.]" Gillum, 3 F.3d at 121. Though "corruption in an internal affairs department is a matter of public concern. . . . Gillum's focus

_____

Court case to which the subsequent panel decision is faithful.

25

was . . . on the issue only insofar as it impacted his wish to continue his investigation[.]" Id. Like Terrell, Gillum spoke "as an employee embroiled in a personal employment dispute." Id. Therefore, Gillum's speech did not warrant First Amendment protection.

In Benningfield v. City of Houston, 157 F.3d 369 (5th Cir. 1998), our next mixed speech case, Benningfield, Grant, and Frankhouser, female employees with the Houston Police Department, complained of sex discrimination and forced the resignation of their supervisor. Unfortunately for the plaintiffs, their supervisor's son took his father's place and, plaintiffs alleged, retaliated against the plaintiffs by demoting Benningfield and constructively discharging Grant and Frankhouser.

Conducting an abbreviated content-context-form analysis, the Benningfield court first noted that the plaintiffs' motivations included personal considerations: "[t]he Plaintiffs thought that their personal careers were being negatively affected by mismanagement, gender discrimination, and a hostile work environment." Id. at 375. Nevertheless, their speech also contained matters of public concern: "The Plaintiffs complained about contamination of criminal histories . . . . result[ing] from mismanagement and, in some instances, deliberate tampering." Id. Therefore, the Benningfield court found the speech related to the public concern, despite the "fact that Plaintiffs chose to file internal grievances rather than publicize their

26

complaints[.]"  Id. (citing Givhan, 439 U.S. at 414-17).

Finally, we reach 1999, a year in which this Circuit decided two significant mixed speech cases, Harris v. Victoria Indep. Sch. Dist., 168 F.3d 216 (5th Cir. 1999) and Teague, 179 F.3d at 377.  The facts of Harris involve two teachers, Harris and Martin, who served on a committee formed to create and implement an improvement plan for Victoria High School ("VHS").  Harris and Martin performed this task, which involved criticizing the principle of VHS, Porche, who, apparently, was resisting the improvement plan and failing to cooperate with the committee. Harris and Martin advocated replacing Porche.  Their superintendent, Brezina, who had appointed Harris and Martin to the committee, then transferred Harris and Martin in response to their criticisms of Porche.

Acknowledging that "[t]he Plaintiffs' speech does not fit neatly within any of the factual scenarios in which we have held speech involved a matter of public concern," Harris, 168 F.3d at 222, the Harris court nevertheless found the speech to relate to the public concern.  First, the panel highlighted the context and form of the speech: Harris and Martin "spoke . . . as elected representatives of the faculty, and . . . they simply communicated the views of the faculty to the administration in compliance with their duties as committee members."  Id.  The court continued: "[Plaintiffs] faced . . . the choice of either telling the truth and fulfilling their duty as committee members

or keeping silent and frustrating their purpose and function on the committee." Id. "By protecting Plaintiffs' speech when the administration requested them, as committee members, to speak truthfully on the school's progress, we are protecting 'the integrity of the truth seeking process.'" Id. (quoting Green v. Philadelphia Hous. Auth., 105 F.3d 882, 886 (3d Cir. 1997)).

The Harris court next examined the content of the plaintiffs' speech and identified both personal and public interests in it: "Plaintiffs certainly had an interest in their speech as employees, because they could not help but benefit as teachers from the improvement of the educational environment at VHS. However, they also had strong interests as committee members in achieving the goals the committee set for itself and the school." Id. The panel then remarked that no evidence suggested that plaintiffs' speech was merely an outgrowth of a personal employment dispute, and that the speech took place against a backdrop of public discussion of the problems at Victoria High School. Therefore, Harris and Martin spoke on a matter of public concern.

In Teague, Teague and Burkett, two police officers with the Flower Mound police department, investigated a fellow officer, Jones, whom they suspected of having committed aggravated perjury. Teague and Burkett's supervisor, Chief Brungardt, eventually halted their investigation and hired a private investigation firm which exonerated Jones. Teague and Burkett

28

believed the exoneration was unwarranted, so they requested a meeting with Chief Brungardt. Chief Brungardt rebuffed them, claiming that the district attorney's office had also examined the facts and concluded that Jones was innocent of wrongdoing. Teague called the district attorney's office and learned that it had never investigated Jones. At that point, Teague and Burkett filed a grievance against Chief Brungardt. Chief Brungardt then transferred Teague and Burkett, initiated an investigation of them, and ultimately terminated them.

After chronicling Terrell, Moore, Gillum, Wilson, and Benningfield (but exempting any discussion of Thompson), the Teague court concluded that Teague and Burkett did not speak on matters relating to the public concern. Though the court conceded that the content of their speech was public, it found the context of their speech to be "a private employee-employer dispute." 179 F.3d at 382. Moreover, the court determined the form to be private, in that Teague and Burkett's "focus . . . was primarily on clearing their names—not on rooting out police corruption per se." Id. Therefore, Teague and Burkett's speech did not relate to the public concern.

Having thus canvassed our mixed speech precedent, we discern three reliable principles. First, the content of the speech may relate to the public concern if it does not involve solely personal matters or strictly a discussion of management policies that is only interesting to the public by virtue of the manager's

29

status as an arm of the government. See Wilson, 973 F.2d at 1269; Terrell, 792 F.2d at 1362 n.5. If releasing the speech to the public would inform the populace of more than the fact of an employee's employment grievance, the content of the speech may be public in nature. See Thompson, 901 F.2d at 463 n.5. Second, speech need not be made to the public, see Benningfield, 157 F.3d at 375; Wilson, 973 F.2d at 1270; Thompson, 901 F.2d at 467, but it may relate to the public concern if it is made against the backdrop of public debate. See Harris, 168 F.3d at 222; Moore, 877 F.2d at 371. And third, the speech cannot be made in furtherance of a personal employer-employee dispute if it is to relate to the public concern. See Teague, 179 F.3d at 383; Harris, 168 F.3d at 222; Gillum, 3 F.3d at 121; Moore, 877 F.2d at 370 n.2; Terrell, 792 F.2d at 1363. With these distillations of our case law firmly in mind, we now turn to the facts at hand.

With respect to content, any arguments that Kennedy's speech did not involve a matter of public concern are not well taken.[14]

_____

[14] To argue that the content is private, appellees have improperly lumped this dispute over security at the Library's branches into the category of disputes over working conditions, which, in turn, are private matters not involving the public concern. Examples of disputes over working conditions, however, belie their assertion: the category of "working conditions" encompasses "the length of time on the job, the number of breaks employees received and so forth." Piver v. Pender County Bd. of Educ., 835 F.2d 1076, 1079 (4th Cir. 1987), quoted with approval in Thompson, 901 F.2d at 467. Speech about policy changes occasioned by the violent rape of a coworker obviously contains a gravity and seriousness, and therefore also a claim to the public's concern, that gab about "working conditions" lacks.

Appellees do cite one case from this Circuit that they claim

30

Kennedy spoke about how to guard against a recurrence of a violent crime that had shaken the local community and generated significant press coverage.[15]  Speech that potentially affects public safety relates to the public concern.  See Thompson, 901 F.2d at 466; Moore, 877 F.2d at 370; see also Hiers, supra note 12, at 811 ("Public employee speech concerning matters affecting community safety also generally meets the [public concern] test [in the Fifth Circuit]." (citing Thompson, 901 F.2d at 466, Moore v. MVSU, 871 F.2d 545, 551 (5th Cir. 1989), and Moore, 877 F.2d at 370)).  And unlike Terrell and Connick, where "the only reason that the public would be concerned about the speech there at issue was because it involved a public workplace," Wilson, 973 F.2d at 1269, releasing Kennedy's letter to the public would reveal information—not about a disgruntled employee's dispute with his employer—but about public safety at the Library in which

_____

stands for the proposition that matters of security do not relate to the public concern.  See Robinson v. Boyer, 825 F.2d 64 (5th Cir. 1987).  Appellees, however, are incorrect.  The Robinson court never reached the question of whether Robinson's speech related to the public concern.  Rather, the panel limited its First Amendment holding to determining that, on the record, Robinson had not shown that his speech was the substantial or motivating factor behind the decision to terminate him.  See id. at 68.

Appellees therefore have failed to advance a meritorious argument in favor of the proposition that the content of Kennedy's speech was private.

[15]     In the Board's own words, "news of the brutal attack was immediately broadcast by the press and was the topic of constant discussion in the Tangipahoa Parish Community. . . . [N]ews of the attack was a matter of public concern."  Brief for Appees., p. 23.

the public would be interested.  See Thompson, 901 F.2d at 463.

The very fact of newspaper coverage of the October 23, 1997 Board

of Control meeting (and its mention of Kennedy's letter)

indicates that "the public was receptive and eager to hear about"

the implementation of safety measures at the Library.  Moore, 877

F.2d at 371.

Additionally, speech made against the backdrop of ongoing

commentary and debate in the press involves the public concern.

See Harris, 168 F.3d at 222-23; Tompkins, 26 F.3d at 607; Brawner

v. City of Richardson, Texas, 855 F.2d 187, 191 (5th Cir. 1988)

(holding speech to relate to the public concern where "the

statements in the letter must be seen in the context of a

continuing commentary that had originated in the public forum of

the newspaper."); Moore, 877 F.2d at 371.  Moreover, as in

Gonzales, Kennedy's speech revealed "uncertainty [about safety

that] generated friction and reduced the efficiency of the

[Library]."  774 F.2d at 1301.  Kennedy also sought to expose

what she characterized as Sledge and the Board's misconduct in

making no security provisions for the Library—thereby endangering

both patrons and employees—and for their lax response to

Patanella's rape.  Speech exposing official misconduct involves

the public concern.  See Teague, 179 F.3d at 383.[16]  Finally,

_____

[16]     While no case in this Circuit specifically defines
"official misconduct" or "wrongdoing," the term clearly envelopes
conduct exposing the state to mere civil liability.  See Connick,
461 U.S. at 148 n.8 ("[The] right to protest racial

32

Kennedy, unlike Terrell, Gillum, Teague, and Burkett, did not speak about matters solely of personal interest, nor, in the course of suggesting an amendment to Library policy, did she criticize the management style or job performance of her direct superior. See Teague, 179 F.3d at 382; Gillum, 3 F.3d at 121; Terrell, 792 F.2d at 1363.

The context of the speech was initially private, but became public. Kennedy distributed her letter on a "need to know" basis to Patanella, the Library branch managers, Sledge, and the Board members. She did not release her letter to the press or otherwise seek to publicize it. Nevertheless, the Daily Star published a newspaper article mentioning Kennedy's letter,[17] and the Board claims that, at some point thereafter, members of the community obtained copies of the letter.

As we have seen in Thompson, Wilson, and Benningfield, by intending to speak privately, Kennedy did not forfeit her First Amendment protection. "Neither the [First] Amendment itself nor our decisions indicate that . . . freedom [of speech] is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public." Givhan, 439 U.S. at 415-16. "The fact that [plaintiffs] chose

---

discrimination [is] a matter inherently of public concern[.]"); Wilson, 973 F.2d at 1269 (holding that reports of alleged sexual harassment constitute reports of public official wrongdoing).

[17]  See Schon, supra note 5.

33

[not] to . . . publicize their complaints is not dispositive."
Benningfield, 157 F.3d at 374; see also Brown v. Texas A & M
Univ., 804 F.2d 327, 337 (5th Cir. 1986) ("The fact that the
speech was delivered privately to [Brown's] superiors, rather
than to Bob Woodward and Carl Bernstein, does not necessarily
render the speech any less protected." (footnote omitted)).
"Rather, the publicization of the speech at issue, appropriately
viewed, is simply another factor to be weighed in analyzing
whether [the] alleged speech addressed matters of public
concern."  Thompson, 901 F.2d at 466.

Moreover, unlike Terrell, where Terrell neither publicized
his accusations nor "would [he] have had any occasion to do so,"
792 F.2d at 1363, Kennedy obviously had opportunities to air her
concerns to the public because the newspaper reported on the
existence of her letter, the same article quoted Kennedy's
approval of the Board of Control's decision to adopt Sledge's
safety program, and the appellees concede that the public
obtained copies of Kennedy's letter.  Additionally, whereas the
investigation in Terrell was a wholly intra-departmental affair,
an agency external to the Library, the Council, insisted that
Sledge devise a safety program.  Therefore, unlike Terrell, where
Terrell's speech regarding an intra-departmental investigation
related only to his own job, Kennedy's speech here referred to
producing a safety plan demanded by the Parish at large to
safeguard patrons and employees alike, and indeed, her own

34

suggestion appeared within the plan itself.  Indeed, any hint of personal gain that Kennedy could have derived from penning her letter is notably absent from the record.  See Thompson, 901 F.2d at 465.  Therefore, the context of Kennedy's speech posits no obstacle to according her letter First Amendment protection.

Finally, the form of the speech indicates that it was of a public nature.  Specifically, Kennedy did not write the letter in the context of an employer-employee dispute.  See Connick, 461 U.S. at 148 (holding that questions functioning "as mere extensions of Myers' dispute over her transfer to another section of the criminal court" did not involve the public concern); Teague, 179 F.3d at 383; Harris, 168 F.3d at 222.  Just as in Moore and Harris, nothing suggests that her working relationship with her superiors was unpleasant.  Indeed, the record reflects that Kennedy had a very positive relationship with Sledge, who repeatedly gave Kennedy glowing reviews, recommended raises, and encouraged Kennedy to take initiative and be a leader.

Moreover, unlike Teague and Gillum, the record does not intimate that Kennedy's letter itself sparked an employment dispute.  Upon first reading the letter, Sledge remarked only that Kennedy had written it well without hinting in the slightest that Kennedy's conduct somehow exceeded the bounds of workplace decorum. Appellees further concede that the letter was "written in a humble and cordial tone."  See Brief for Appees., p. 24 n.8.  And the contents of the letter were obviously non-controversial: Kennedy's

proposed requirements of at least two employees on duty at all times and closing library branches when only one employee is present mirrored (or perhaps were incorporated into) Sledge's own security proposal.

Finally, unlike <u>Gonzales</u>–where the speech involved was found nevertheless to be protected–Kennedy's proposal did not even impact her own job.  Kennedy did not work in any of the branches that were short-staffed and never would confront a situation in which she had to work alone.  <u>See</u> <u>Tompkins</u>, 26 F.3d at 605-607 (finding speech to relate to the public concern where a teacher criticized the cancellation of an art program at another school).

Weighing these factors—the public nature of the content, the public-leaning nature of the context, and the public nature of the form of the speech—yields the conclusion that Kennedy spoke on a matter of public concern.[18]  She therefore stated a claim for

---

[18]    <u>Teague</u> cites <u>Gillum</u> for the proposition that context and form weigh more heavily than content in the Fifth Circuit because "we are chary of an analytical path that takes judges so uncomfortably close to content based inquiries."  <u>Teague</u>, 179 F.3d at 382 (quoting <u>Gillum</u>, 3 F.3d at 121). But <u>Gillum</u> does not even apply the content-context-form test, much less expound upon which factors should weigh more or less heavily than others. <u>Gillum</u> opts for the citizen-employee test, focusing exclusively upon "the hat worn by the employee when speaking[.]" 3 F.3d at 121.  Moreover, no Supreme Court or Fifth Circuit precedent provides support for weighing the factors of content, context and form differently.  Indeed, the Supreme Court directs us only to look to "the content, form, and context of a given statement, as revealed by the whole court record."  <u>Connick</u>, 461 U.S. at 147-48.  And as our examination of the relevant cases above reveals, in Fifth Circuit case law prior to <u>Teague</u>, content consistently played a significant role in determining the nature of the speech.  Finally, though judges are traditionally, and rightly,

36

retaliation in violation of the First Amendment.

Though we are not obligated to apply the citizen-employee test in mixed speech cases, we observe that it produces an identical conclusion. Following <u>Connick</u>, we must ascertain whether Kennedy spoke "not as a citizen upon matters of public concern, but instead as an employee upon matters <u>only</u> of personal interest." 461 U.S. at 147 (emphasis added). Here Kennedy clearly was not speaking upon matters only of personal interest, and indeed, she spoke "primarily in [her] role as citizen." <u>Terrell</u>, 792 F.2d at 1362. First, the content of her speech involved a matter of public safety. See <u>Thompson</u>, 901 F.2d at 466. Second, her speech introduced proposed policy changes that would not impact her own working situation. See <u>Tompkins</u>, 26 F.3d at 607 (rejecting an argument that Tompkins spoke on a matter of personal interest where he criticized the abandonment of an art program at a high school where he did not teach). Moreover, her proposed amendments did not entail criticism of her immediate superior's job performance or

concerned about content-based inquiries, our Circuit's public employee speech cases contain explicitly content-based inquiries. For instance, in a case where an employee conceded that he was speaking primarily in his capacity as such, and where the speech was not directed to the public and was part of his employment duties (as distinguished from speech not directed to the public that is <u>about</u> the employment, workplace, or employer, though not part of the performance of job duties), we held the speech to fall outside the purview of the First Amendment because it did not expose corruption or wrongdoing. See <u>Wallace v. Texas Tech Univ.</u>, 80 F.3d 1042, 1050-51 (5th Cir. 1996). In essence, <u>Wallace</u> looked <u>only</u> to content to ascertain the protectability of the speech, and thus constitutes an explicitly content-based precedent.

37

management style.  See Terrell, 792 F.2d at 363.  Third, she spoke against a backdrop of vigorous public debate, indicating that the rape and the Library's security policy was of interest to the community at large.  See Moore, 877 F.2d at 371 ("[T]he public was receptive and eager to hear about the ability of the Fire Department to perform its duties.").  Finally, her letter had nothing to do with an ongoing employment dispute, an element that usually suggests the speech is made in the capacity of "employee." See Teague, 179 F.3d at 383 ("During all relevant events, Teague . . . [was] acting in [his] capacity as [an] employee[] embroiled in an employment dispute.").

Because Kennedy's complaint reveals that she spoke on a matter of public concern, we hold that the district court should not have dismissed her complaint for failure to state a claim.

We must still consider, however, the possibility that the district court dismissed Kennedy's claim without considering her first amended complaint.  Though the lower court permitted Kennedy's first amended complaint to remain in the record, we have nothing but appellees' assurances that the trial court considered it.

If the district court dismissed Kennedy's complaint without an opportunity to amend, it erred.  "Ordinarily, when a complaint does not establish a cause of action in a case raising the issue of immunity, a district court should provide the plaintiff an opportunity to satisfy the heightened pleading requirements of

38

these cases." <u>Jacquez v. R.K. Procunier</u>, 801 F.2d 789, 792 (5th Cir. 1986); <u>see</u> <u>also</u> <u>Wicks v. Mississippi State Employment Servs.</u>, 41 F.3d 991, 997 (5th Cir. 1995). "Dismissing an action after giving the plaintiff only one opportunity to state his case is ordinarily unjustified." <u>Jacquez</u>, 801 F.2d at 792. However, "if a complaint alleges the plaintiff's best case, there is no need to remand for a further factual statement from the plaintiff." <u>Jones v. M.L. Greninger</u>, 188 F.3d 322, 327 (5th Cir. 1999).

Kennedy's initial complaint unquestionably did not allege her best case: at 23 paragraphs, it is short on facts and law, but long on conclusory statements. Kennedy's first amended complaint remedies these failings: at 86 paragraphs, it states a claim for a First Amendment violation, explaining specifically why her speech is of public concern, and why her interests outweigh those of the Board. Therefore, the district court should not have denied Kennedy leave to amend.

We hold that the district court should have permitted Kennedy to amend her complaint and should have considered the first amended complaint if it did not. We further conclude that Kennedy alleged, as a matter of law, that her speech related to the public concern. We therefore must reverse the district court's dismissal of Kennedy's claim on any of the aforementioned grounds and, subject to our summary judgment analysis below, remand for a new trial on the merits.

### III.    Qualified Immunity

The district court granted Sledge's motion for summary judgment on grounds of qualified immunity. Kennedy argues that in so doing, it erred because she has alleged a violation of a clearly established right and raised a fact issue as to whether Sledge acted in an objectively reasonable manner in demoting her for writing the letter. Appellees respond that Kennedy's right to speak on security matters was not clearly established at the time Sledge fired Kennedy.

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see also Wilson v. Layne, 119 S. Ct. 1692, 1699 (1999). To ascertain the availability of this defense, we must first examine whether the "plaintiff has alleged a violation of a clearly established right." Fontenot v. Cormier, 56 F.3d 669, 673 (5th Cir. 1995); see also Siegert v. Gilley, 500 U.S. 226, 231 (1991). Second, we must ask whether the defendants' conduct was objectively reasonable in light of "clearly established" law at the time of the alleged violation. Siegert, 500 U.S. at 231-32; see also Kelly v. Foti, 77 F.3d 819, 821 (5th Cir. 1995).

As Kennedy has stated a First Amendment claim, she has alleged

40

a violation of a clearly established right. Since 1983, the year the Supreme Court decided Connick, government employers have known that, unless their interest in efficiency at the office outweighs the employee's interest in speaking, they cannot fire their employees for making statements that relate to the public concern. Though Sledge argues vigorously that the law does not support Kennedy's right to speak on security matters, she is defining the right far too narrowly. See Warnock v. Pecos County, Texas, 116 F.3d 776, 782 (5th Cir. 1997) (holding that, though the contours of a right must be adequately defined, "'[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful.'" (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987))). Kennedy has a clearly established right to speak on matters of public concern, see Denton v. Morgan, 136 F.3d 1038, 1042 (5th Cir. 1998), on matters of public safety, see Thompson, 901 F.2d at 466, and on matters of official misconduct. See Brawner, 855 F.2d at 192-93 ("At the time . . . Brawner was discharged . . . . [i]t was clearly established that a public employee's speech revealing improper conduct by fellow employees was protected."). Therefore, Kennedy's right to speak as a citizen about Library security issues stemming from Patanella's rape was clearly established.

Moreover, Kennedy has presented a fact issue sufficient to survive summary judgment as to whether Sledge acted in an objectively reasonable manner in light of Kennedy's clearly

41

established rights. Government employers undoubtedly have broad authority and discretion to discipline employees whose speech impairs the smooth and efficient operation of government offices. See Connick, 461 U.S. at 151 ("'[T]he government, as employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch.'" (quoting Arnett v. Kennedy, 416 U.S. 134, 168 (1974) (Powell, J., concurring and dissenting))). But government employers also know that "public officials must 'engage in the McBee-Pickering-Connick balancing before taking disciplinary action.'" Warnock, 116 F.3d at 782 (quoting Click v. Copeland, 970 F.2d 106, 112 (5th Cir. 1992)). This test "requires full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public," Connick, 461 U.S. at 150, but nevertheless remains the minimum a government employer must do before deciding to discipline an employee for speaking on a matter of public concern. Sledge admits that she never gave Kennedy's First Amendment rights any thought at all before she demoted her. Thus, unless Kennedy has failed to present a fact issue as to whether her interests outweigh those of appellees, this concession is fatal to Sledge's claim for qualified immunity.

Applying the McBee-Pickering-Connick balancing test to this summary judgment record, we find that it favors Kennedy. The

42

balancing test demands that we consider whether Kennedy's speech (1) was likely to generate controversy and disruption, (2) impeded the department's general performance and operation, and (3) affected working relationships necessary to the department's proper functioning. See Brawner, 855 F.2d at 192.

First, as the letter struck a "humble and cordial" tone and bolstered the suggestions in Sledge's own security plan, we conclude that it was not likely to generate controversy and disruption. Though the letter did urge Sledge and the Board to act, and sought to prevent them from de-emphasizing the gravity of the rape, Sledge did not find these aspects of the letter disruptive or likely to generate controversy when she first read the letter, and we may conclude that Kennedy's tone and her narrow distribution of the letter allayed the letter's potential in this regard.[19]

---

[19] Sledge avers that Kennedy's conduct after Sledge demoted her was disruptive and controversial. Specifically, Sledge alleges that Kennedy encouraged her coworkers to carry tape recorders to work, to file grievances, and to request financial information about the Library. Sledge faces two problems with this argument. The first is a matter of proof. Sledge has presented absolutely no evidence showing that Kennedy encouraged her coworkers to behave insubordinately; Sledge merely presented evidence of the other employees' contumacious conduct and now asks this court to assume that Kennedy instigated it. This we cannot do on summary judgment.

The second problem is one of relevance. The McBee-Pickering-Connick test balances the potential of the speech involved to cause disruption and controversy. And Sledge never argues that Kennedy's letter precipitated the problems with Kennedy's coworkers. Rather, she concedes that the issue with Kennedy's coworkers arose only after Sledge demoted Kennedy—in response to her letter—without considering her First Amendment

43

Sledge does argue that Kennedy made allegedly derogatory comments about local communities in the letter, and that, by virtue of having signed the letter in her official capacity, Kennedy misled the public into believing that the letter was a statement of Library policy. This, Sledge asserts, caused disruption and controversy. Sledge's argument here must fail. Kennedy only distributed her letter to Sledge, Patanella, the Library's branch managers, and the Board of Control members—a group of individuals who all knew Kennedy's position in the Library and were well aware that her letter did not state Library policy. The record reveals that the only people who might have been confused learned of the letter and its contents through an October 24, 1997 news article, which ran after Sledge demoted Kennedy on October 23, 1997. Therefore, any confusion that Kennedy's letter might have generated could not have been a factor in Kennedy's demotion because the confusion would have arisen after Sledge demoted Kennedy.

---

rights. Therefore, the conduct of Kennedy's coworkers is not relevant to the McBee-Pickering-Connick balancing test.

Sledge also points to Kennedy's propounding of a memorandum critical of the Board's proposed budget for the Library as evidence of her insubordination. Kennedy's actions in distributing this memorandum are so analogous to the facts of Pickering v. Board of Educ. of Township High Sch. Dist. 205, Will County, Illinois, 391 U.S. 563 (1968), that her speech in the memorandum would most likely be related to a matter of the public concern and therefore protected by the First Amendment.

Finally, to the extent that Sledge presents this evidence of Kennedy's alleged insubordination subsequent to being demoted to show that Kennedy caused Sledge to fire her for insubordination two weeks after her demotion, that argument goes to Kennedy's damages, an issue not before us presently.

Second, the letter would not have impeded the Library's general performance and operation: it did not have any bearing on the day-to-day business of circulating books within the community. Cf. Moore, 877 F.2d at 374 (holding that Moore's insubordinate statements to the press did not "interfere in any way with the actual fighting of fires."). Finally, the letter did not disrupt any working relationships necessary for the Library's efficient functioning. Neither Sledge nor the Board had to interact with Kennedy on a day-to-day basis. Cf. Pickering v. Board of Educ. of Township High Sch. Dist. 205, Will County, Illinois, 391 U.S. 563, 569-70 (1968) ("[Pickering's] statements are in no way directed towards any person with whom [he] would normally be in contact in the course of his daily work as a teacher."). Moreover, Sledge actually complimented Kennedy on the letter when she saw it, and any deterioration in Sledge's relationship with Kennedy may be fairly traced to Sledge demoting Kennedy. Thus, based solely on the summary judgment record before us, Kennedy's interests in speaking outweigh any minuscule loss in efficiency to the Library occasioned by her letter.

Viewing these facts, as we must on summary judgment, in the light most favorable to Kennedy, she has alleged a violation of a clearly established right and also raised a fact issue as to whether Sledge acted in an objectively reasonable manner in light of Kennedy's clearly established rights.

So as to preempt any confusion about the implications of this

45

holding, we clarify that we express no opinion as to whether Sledge in fact acted in an objectively reasonable manner or whether she ultimately will be entitled to qualified immunity. Our only holding is that we cannot tell, at the summary judgment stage of the case where we must view the evidence in the light most favorable to Kennedy, whether Sledge acted in an objectively reasonable manner. We further caution that our holding today turns on four critical concessions by appellees: (1) appellees admitted that Sledge demoted Kennedy in response to the letter; (2) Sledge confessed that she gave Kennedy's First Amendment rights no thought before demoting her; (3) the Board agreed that Patanella's rape was a matter of public concern; and (4) appellees characterized the tone of Kennedy's letter as "humble and cordial," not controversial or disruptive. At trial, however, "a very different picture may result than the one painted by the summary judgment record because [Kennedy] must prove the issues that this opinion assumes in [her] favor, and the jury can choose to credit certain facts over others, which we cannot do in reviewing a [grant] of summary judgment." Gutierrez v. City of San Antonio, Texas, 139 F.3d 441, 451 (5th Cir. 1998).

Therefore, we hold that the district court erred when it granted Sledge summary judgment on the issue of qualified immunity.

## IV. Conclusion

We hold, as a matter of law, that Kennedy spoke on a matter

46

of public concern, and therefore, that her first amended complaint states a claim for retaliation in violation of the First Amendment.  We further hold that the district court should have granted Kennedy leave to amend her complaint and should have considered her first amended complaint.  We are thus constrained to reverse the district court's dismissal of the case on these grounds and remand for a new trial on the merits.

We further hold that Kennedy has alleged a violation of a clearly established constitutional right and raised a fact issue as to whether Sledge acted in an objectively reasonable manner in demoting Kennedy in response to her letter.  We therefore reverse the district court's grant of summary judgment on this ground and remand for a trial on the merits.

REVERSED and REMANDED.