Imelda T. RODRIGUEZ, Plaintiff,

v.

**BOARD OF TRUSTEES OF THE LAR-
EDO INDEPENDENT SCHOOL DIS-
TRICT, and Paul Cruz, in His Official
and Individual Capacities, Defendants.**

**CIV.A. No. L–99–22.**

United States District Court,
S.D. Texas,
Laredo Division.

April 18, 2001.

David T. Lopez, David Lopez & Associates, Houston, TX, for plaintiff.

Dennis J. Eichelbaum, Schwartz and Eichelbaum, Plano, TX, Leonard J. Schwartz, Schwartz & Eichelbaum, Austin, TX, Deirdre Annette Vasquez, Attorney at Law, San Antonio, TX, for Board of Trustees of Laredo Independent School District.

## MEMORANDUM AND ORDER

ELLISON, District Judge.

Pending before this Court are Plaintiff's Motion for Reconsideration and Defendants' Motion for Summary Judgment. The Court **DENIES** reconsideration of the dismissed § 1983 claims against Defendants Laredo Independent School District and Paul Cruz.[1] Viewed in the light most favorable to Plaintiff, the pleadings and supporting discovery materials fail to raise a genuine issue concerning the Texas Whistleblower claim. The Court therefore **GRANTS** Defendants' Motion for Summary Judgment and dismisses all remaining claims.

Because the pertinent legal issues can properly be understood only against the background of fact, the Court will first review the Plaintiff's allegations and the evidence adduced. Next, the § 1983 claims will be analyzed, and lastly, Plaintiff's Whistleblower claim.

## I. FACTUAL BACKGROUND

Plaintiff Imelda T. Rodriguez received a B.S. degree in education in 1977 from Laredo State University. Rodriguez earned a master's degree in secondary education in 1980, and a mid-management certificate in 1984. Rodriguez Dep. I at 20–21, 23. In

---

1. The Court's Order of February 20, 2001, is hereby amended to conform with the instant Memorandum and Order. *See infra* Section II.A.2.

1977, Rodriguez began working for Defendant Laredo Independent School District ("LISD"), as a teacher at J.W. Nixon High School. *Id.* at 32–33. She first worked at LISD's central office in 1987, where she was employed as a language arts supervisor. *Id.* at 33–34. In 1992 or 1993, Rodriguez was promoted to the position of LISD's director of secondary education. *Id.* at 39. In that position, she oversaw curriculum and instruction at each of LISD's middle and high schools. *Id.* at 41. Rodriguez was promoted again, in 1997, to assistant superintendent for curriculum and program accountability. *Id.* at 43; LISD Exh. 3 at 1.[2] In this position, Rodriguez was responsible for LISD's compliance with Texas Education Agency ("TEA") standards for school district performance. Rodriguez Dep. I at 45. Finally, in the Fall of 1998, Rodriguez was reassigned to the position of Administrative Assistant II, supervising custodians and textbooks. LISD Exh. 3 at 3.

The Court, in its order of February 2, 2000, has already identified a number of facts alleged in Rodriguez's Complaint surrounding her 1998 reassignment. Discovery in this case has primarily focused on the following issues: (1) alleged "pacing" by teachers during the administration of TAAS tests; (2) allegations that administrators and teachers placed students into special education solely to avoid TAAS testing; (3) an alleged improper disclosure of a TAAS examination. The Court sets forth the factual basis for each of these issues in Sections I.A.-I.C., *infra.*

The parties, in discovery, have also emphasized the events leading to Rodriguez's reassignment by Defendant Paul Cruz. Rodriguez's reassignment was the culmination of meetings and written communications between Rodriguez and Defendant Paul Cruz during the period of August 1998 through November 1998. On November 4, 1998, Cruz formally communicated to Rodriguez his decision to reassign her, and the supporting reasons. Cruz's November 4 memorandum identified the following concerns: (1) the "climate in [Rodriguez's] department," (2) Rodriguez's failure to document issues regarding the Science Fair and School Choice Program, (3) Rodriguez's failure to provide written guidance on special education coding, (4) Rodriguez's failure to provide documentation on departmentalization, and (5) Rodriguez's failure to follow other directives from Cruz. LISD Exh. 3 at 3. Rodriguez was reassigned, effective December 1, 1998, to an Administrative Assistant II position as a supervisor of custodians and textbooks. *Id.* In Section I.D., *infra,* the Court evaluates Cruz's stated reasons for reassignment, as well as whether Rodriguez was punished for making reports to Cruz regarding pacing, special education coding, and the alleged disclosure of the TAAS prompt.

### A. Pacing Allegations

#### 1. Pacing in General

The Texas Assessment of Academic Skills ("TAAS") is a statewide test designed to measure curriculum quality in various subjects at the elementary, middle school, and high school levels. According to the Coordinator Manual published by the Texas Education Agency ("TEA") in 1997 and 1998, TAAS is not timed, and "each examinee must be allowed to have as much time as necessary to respond to every test item." LISD Exh. 19 at 6 (origi-

---

**2.** Rodriguez's deposition testimony identifies the date of this last promotion as 1987, but that year is obviously wrong. The correct date is likely 1997, because early in that year, Humberto Trevino still held the position. Rodriguez Dep. I at 80; LISD Exh. 83; *see also* Complaint ¶ 4.11.

nal at 72); LISD Exh. 20 at 82 (original at 75). Rodriguez, in her Complaint, defines pacing as a "system by which the teacher conducting the testing instructs students, contrary to the mandated testing procedures, to work only on one or a small group of questions ... then stop and not proceed until told to do so by the teacher." Complaint ¶ 4.34.[3] Pacing allegedly makes "the teacher aware of what all the students are working on." *Id.* ¶ 4.35.

According to Rodriguez, several teachers told Cynthia Conchas, LISD's director of elementary education, that TAAS scores were declining because "they were not allowed to pace." Rodriguez Dep. I at 249. During the 1997–1998 school year, two principals allegedly asked LISD's assistant director of assessment and evaluation, Rosauro Rodriguez, whether pacing was allowed. *Id.* at 257. In a "quadrant meeting"[4] with other principals to discuss TAAS results, Plaintiff Imelda Rodriguez asked if anyone had used pacing prior to 1997–1998. *Id.* at 260. According to Rodriguez's testimony, one principal replied, "All of us have." *Id.*

### 2. Pacing as a Means of Giving Improper Assistance

Rodriguez also alleges that pacing allows a teacher to "provide improper and unlawful assistance" to students taking the TAAS. Complaint ¶ 4.35. She alleges that pacing led not only to improper assistance, but also to rewards such as candy for correct answers by students. *Id.* Rodriguez introduces, as evidence supporting her allegations, a memorandum she wrote on July 10, 1998, in which she summarizes

a statement by elementary school teacher Sylvia Artolozaga that other teachers had paced in prior years. LISD Exh. 88 at 1. Rodriguez's memorandum further states that, according to Artolozaga, the other teachers "worked the first two-three problems with the students, and provided some guidance during the rest of the test." *Id.* at 1–2.

Rodriguez presents little evidence that cheating ever occurred as a result of pacing. *See* Rodriguez Dep. I at 214 (stating that she does "not know the name of any specific teacher" who had used pacing to assist a student). At one point in her deposition, Rodriguez notes that a principal told her that teachers used pacing in prior years to provide students with answers. Rodriguez Dep. II at 46, 65. But Rodriguez had no direct knowledge regarding this allegation, and she did not report it to the TEA testing coordinator. *Id.* at 52. Rosaura Rodriguez, in her deposition, stated that she had never heard of any teacher who used pacing to assist students with answers. Rosaura Rodriguez Dep. at 12.

### B. Improper Coding of Students for Special Education

Rodriguez alleges that, in February of 1997, a consultant hired by LISD to analyze TAAS data made her aware that one of LISD's high schools had exempted from TAAS a greater number of students than expected. Rodriguez Dep. I at 68.[5] Rodriguez did not write a report about this finding, but discussed the matter with Hector Elizondo, LISD's TAAS coordina-

---

3. All references to "Complaint" refer to Rodriguez's Original Complaint.

4. LISD schools appear to be divided into four groups, or "quadrants." Rodriguez conducted conferences with school principals by quadrant. *See* Rodriguez Dep. I at 79.

5. Rodriguez also discussed exemption rates with the principal of one high school in August 1995. *Id.* at 81–83.

tor and director of assessment. *Id.* at 72. Elizondo told Rodriguez that the exemptions were for recent immigrants, special education students, and "second-year sophomores." *Id.* at 75. Rodriguez stated her belief that the TEA did not permit exemptions for second-year sophomores, but Elizondo replied that he had contacted the TEA, and that these exemptions were allowed. *Id.* at 76.

Rodriguez then discussed the matter of TAAS exemptions with Humberto Trevino, then the assistant superintendent for curriculum and program accountability. *Id.* at 80. Rodriguez described her conversation with Elizondo, and stated that she was concerned that there was nothing in writing from TEA regarding exemptions for second-year sophomores. *Id.* Trevino stated that he would look into the matter. *Id.* at 81. Neither Elizondo nor Trevino reported Rodriguez's concerns to Cruz. Humberto Trevino Aff. at 1; Hector Elizondo Aff. at 1.

These allegations recur in 1998 when Rodriguez informed Cruz at a cabinet meeting [6] that there were too many students being placed in special education. Rodriguez Dep. II at 74. A subsequent meeting was held in late August or early September 1998, with Cruz, Rodriguez, Frances Harrell, LISD's director of special education, and all of LISD's principals. *Id.* at 80. At this meeting, one of the principals complained that he or she lacked information regarding coding of students for special education. *Id.* at 80–81. Harrell replied that the principals all had a copy of a consultant's report addressing these issues. *Id.* at 81. Harrell further stated, in Cruz's presence, that the problem was that principals referred students into special education solely to ex-

empt them from TAAS testing. *Id.* at 81–82.

### C. Alleged Disclosure of Testing Prompt

Rodriguez's Complaint states that, on March 19, 1998, she was informed that an LISD teacher had advance knowledge of the "writing prompt," or essay topic, used on the fourth grade TAAS writing test. Complaint ¶¶ 4.18–20. According to her deposition, Rodriguez received a telephone call from Dolores Medrano, the assistant superintendent of instruction of the neighboring United Independent School District ("UISD"). Rodriguez Dep. I at 88. Medrano informed Rodriguez that, according to an internal investigation by UISD, a teacher at an LISD elementary school had advance knowledge of the TAAS prompt, and shared this information with a UISD teacher. *Id.* at 86. Rodriguez reported the details of this conversation to then-superintendent Ramirez. *Id.* at 89. Ramirez told Rodriguez to contact John Kazen, counsel for LISD, for guidance in conducting an investigation. *Id.* at 90. Rodriguez met with Kazen, who told Rodriguez to contact the principal at the elementary school, and to meet with the teacher concerning the allegation of cheating. *Id.* at 94–95.

Following her meeting with Kazen, Rodriguez met with Luis Zapata, who works for LISD's human resources department. Rodriguez prepared a list of questions for the principal and curriculum specialist, and discussed possible questions for the teacher. Rodriguez Dep. I at 107–08. Rodriguez and Zapata met with the principal, who indicated that he did not deal with TAAS testing. *Id.* at 112–14. Rodriguez and Zapata then met with the principal's curriculum specialist, who stated that she

---

6. "Cabinet" meetings are those involving the superintendent and other top LISD administrators (including Rodriguez). Apparently, such meetings were held to consider district-wide policy matters. *See, e.g.,* LISD Exh. 3 at 2, 6.

kept the TAAS materials in an unlocked cabinet in her office. *Id.* at 117–18. Subsequently, Rodriguez and Zapata met with the teacher involved, who stated that she knew one or two teachers at UISD, but rarely saw them. *Id.* at 136. The teacher stated that she and other teachers shared and reviewed with their students practice materials originally presented at teacher training sessions. *Id.* at 137. The teacher denied sharing this information with teachers from UISD. *Id.* Other teachers at the elementary school were questioned, but none of them admitted being the source of the materials. *Id.* at 143.

Following these interviews, Zapata and Rosaura Rodriguez took over the investigation. Rodriguez Dep. I at 145. Rodriguez subsequently learned that the investigation was terminated, and that no conclusion had been reached regarding possible violations of TEA rules by any LISD teacher or administrator. *Id.* at 149–50. Although a meeting was later held with LISD principals regarding the security of TAAS materials, the TEA never investigated LISD regarding Medrano's allegations. *Id.* at 151. Rodriguez had and has no personal knowledge that any violations of TAAS rules actually occurred during the 1996–1997 and 1997–1998 school years. *Id.* at 152–55.[7]

### D. *Events Leading to Rodriguez's Transfer*

#### 1. Rodriguez's Reports to Cruz of Pacing, Improper Coding, and Improper Disclosures

Rodriguez appears to suggest that she was hindered by the President of the LISD Board, Sharon Jordan, and by Kazen, in reporting all the above allegations.

Rodriguez states that she was reassigned because of her reports to Cruz about pacing, special education tracking, and the alleged improper disclosure of the TAAS prompt.

As an initial matter, the evidence does not support the implication that Rodriguez was hindered in making reports. On the contrary, Jordan told Rodriguez on July 13, 1998 not to mention pacing to the interim superintendent, but to speak directly to Kazen. Rodriguez Dep. I at 259–60. This directive is entirely logical: Cruz would take over as LISD's superintendent in less than one month, so there was no reason to report the issue of violations in the 1996–1997 school year to the interim superintendent. Further, no one—Jordan, the former superintendent, the interim superintendent, or Kazen—stated that they were upset with Rodriguez's comments regarding pacing. *Id.* at 262–63.

Rodriguez reported the pacing allegations to Cruz in her first meeting with him in August 1998. No one else was present at this meeting. Rodriguez Dep. I at 249; Rodriguez Dep. II at 70. Rodriguez informed Cruz that principals admitted to having used pacing in the past, and that teachers blamed the 1997–1998 drop in TAAS scores on not being permitted to pace. Rodriguez Dep. II at 69. Cruz did not appear to be upset by these allegations. Rodriguez Dep. I at 250. Cruz similarly recalls that Rodriguez mentioned pacing as a "factor" in the decline of TAAS scores at LISD schools. Paul Cruz Dep. at 36. According to Cruz, however, Rodriguez did not suggest that pacing was accompanied by cheating or improper assistance from teachers. *Id.* at 37.

---

**7.** In her deposition, Rodriguez states that, during the 1999–2000 school year, she became aware that an elementary teacher allegedly broke the seals on TAAS materials prior to the test administration. Rodriguez Dep. II at 166–67. This allegation is not relevant to Rodriguez's 1998 reassignment.

The meetings between Rodriguez, Cruz, and others regarding coding of special education students have been described above. *See supra* Section I.B. Following these meetings, on October 21, 1998, Cruz directed Rodriguez to provide written guidance to LISD principals regarding how to code special education students. Rodriguez Dep. I at 239; Rodriguez Dep. II at 83–84. Rodriguez conducted research into the coding guidance, but produced nothing in writing by November 4, 1998. Rodriguez Dep. I at 239. Rodriguez did not respond by that time because she wanted feedback from the TEA before submitting a plan to the principals. Rodriguez Dep. II at 85–86. Cruz asserted that Rodriguez's unsatisfactory response on the issue of special education coding was one of the factors that led to her reassignment. LISD Exh. 3 at 3. Rodriguez has no information to suggest that the issue of special education coding did not play a part in Cruz's evaluation of her performance. Rodriguez Dep. I at 240.

Finally, Rodriguez appears never to have brought to Cruz's attention the alleged disclosure of the TAAS writing prompt. Her failure to do so is not surprising: according to Rodriguez's own testimony, the issue was resolved satisfactorily in Spring 1998, several months before Cruz became LISD's superintendent. Rodriguez Dep. I at 145–51. Additionally, neither Ramirez, Kazen, Rosaura Rodriguez, nor Raye Lokey (Zapata's supervisor) discussed the investigation with Cruz. Graciela Ramirez Aff. at 1; John Kazen Aff. at 1; Rosaura Rodriguez Aff. at 1; Raye Lokey Aff. at 1.

2. Other Factors in Cruz's Decision to Reassign Rodriguez

In addition to requiring Rodriguez to prepare written guidance on special education coding, Cruz directed her to provide other information. At a principals' meeting held on October 21, 1998, Cruz directed Rodriguez to document her decision-making process regarding LISD's Science Fair and its School Choice Program. Rodriguez Dep. I at 241. At a cabinet meeting held on October 26, 1998, Cruz directed Rodriguez to provide documentation to LISD principals regarding "the flexibility in the implementation in departmentalization." *Id.*

At a cabinet meeting held on November 2, 1998, several principals informed Cruz that they had not yet received the written guidance from Rodriguez on special education coding. Rodriguez offered nothing to dispute this account, although she was not present at this meeting. Rodriguez Dep. I at 242–43. Later that day, Cruz met privately with Rodriguez and informed her that he was dissatisfied with: "the climate of [Rodriguez's] department," *id.* at 169; Rodriguez's failure to provide the written documentation regarding special education coding, *id.* at 172; and Rodriguez's alleged failure to understand that Cruz, as superintendent, was solely responsible for issuing directives. *Id.* at 174. According to Rodriguez, Cruz did not tell her that she was being "insubordinate." *Id.* at 246. Cruz reiterated these areas of dissatisfaction in his November 4, 1998 memorandum formally reassigning Rodriguez. *See* LISD Exh. 3, at 3.

Cruz's November 4 memorandum listed the following concerns: (1) the "climate in [Rodriguez's] department," (2) Rodriguez's failure to document issues regarding the Science Fair and School Choice Program, (3) Rodriguez's failure to provide written guidance on special education coding, (4) Rodriguez's failure to provide documentation on departmentalization, and (5) Rodriguez's failure to follow other directives from Cruz. LISD Exh. 3 at 3. The memo-

randum's first, second, and fifth points require some explanation.

On the first point, the climate of Rodriguez's department, her deposition testimony reveals that she had a number of conflicts with Cynthia Conchas, LISD's director of elementary education. On September 11, 1998, Rodriguez and Conchas met with Cruz. Cruz expressed concern that the mathematics trainers were receiving conflicting directives from Rodriguez and Conchas. Rodriguez Dep. I at 228–29. Cruz also discussed conflicting information from Rodriguez and Conchas regarding the development of time lines for the elementary curriculum. *Id.* at 230. Rodriguez told Cruz that Conchas was not involved in developing these time lines. *Id.* at 231. Conchas, however, told Cruz that she was in fact "highly involved in the development of the time lines." *Id.* Rodriguez admits that Cruz had to believe either Rodriguez or Conchas. *Id.* at 231–32.

The second point concerns a memorandum that Rodriguez wrote to Cruz on October 2, 1998, in which she, on behalf of another administrator, suggested that a teacher inappropriately wrote directly to Cruz regarding the Science Fair project. LISD Exh. 3 at 4. On Rodriguez's view, the teacher should first have written his or her immediate supervisor. *Id.* Rodriguez stated that her concern was not with the Science Fair *per se*, but with the teacher's failure to allow the supervisor to respond before writing to Cruz. Rodriguez Dep. I at 172–73. Nonetheless, Cruz had directed Rodriguez to document her decision-making process on October 26. Rodriguez stated at her deposition that she responded to Cruz in two letters, but she did not recall the dates of these letters. *Id.* at

241. The Court notes that in a letter to Cruz dated November 3, 1998, Rodriguez apologized if she had "offended" him in her October 2 memorandum regarding the Science Fair project. LISD Exh. 62. This letter, however, postdates the November 2 conference in which Cruz informed Rodriguez of her reassignment.

The fifth point, although potentially encompassing the Science Fair issue, also concerns Rodriguez's disagreements with Cruz about the use of additional tests to measure student performance. Prior to Cruz's tenure as superintendent, LISD had paid for Terra Nova, an assessment test for students in grades one through five. Rodriguez Dep. I at 248. Shortly after taking over, Cruz directed that the test not be used. *Id.* Rodriguez preferred that LISD use Terra Nova, because it would provide "another indication of the student's knowledge." *Id.* at 252. Rodriguez also refers to Gates–McGinitie achievement test results, according to which a large number of LISD's sixth grade students were not reading at grade level. Rodriguez Dep. II at 68–69. Although Rodriguez believed that these test data were "very important," *id.* at 76, Cruz stated at an early cabinet meeting that the reporting of these results "would be optional." *Id.* at 75, 79.[8] Rodriguez had no evidence, however, that this disagreement over testing formed any part of the basis of her reassignment. Rodriguez Dep. I at 252–53.

In catchall fashion, Rodriguez alleges that Cruz evinced hostility to her in other ways. Rodriguez's allegations—that Cruz promoted people with whom she did not get along, and that he did not allow her to attend a professional conference—are no-

---

**8.** Differences in opinion regarding testing converge with the ongoing dispute between Rodriguez and Conchas. Conchas stated at this meeting that "There is too much testing going on already in the district." *Id.* at 78.

where set forth with specificity. *See* Complaint ¶¶ 4.86–4.89. Rodriguez fails to provide a context for this alleged discriminatory treatment, such as whether other administrators were ever denied travel funds to attend professional conferences.

Rodriguez also alleges that, following her reassignment, she was not provided with an office computer. Complaint ¶ 4.90. Rodriguez's deposition testimony indicates that her newly created department lacked resources. Rodriguez Dep. II at 27. Rodriguez's position, too, was newly created. *Id.* Although her department's functions— oversight of custodians and textbooks— had previously been assigned to other LISD administrators, Rodriguez soon discovered that "there were many things that had not been done." *Id.* at 28. Within two years, however, Rodriguez's new department functioned well and had a budget. *Id.* at 27.

## II. RECONSIDERATION OF THE § 1983 CLAIMS

The Court has previously ruled that Rodriguez's § 1983 claims against LISD and Cruz fail to state a claim upon which relief may be granted. *See* 82 F.Supp.2d at 683–84 (holding that the claim against LISD fails to state a claim of municipal liability under *Monell* ); *id.* at 688 (holding that Cruz is entitled to qualified immunity because "he could not . . . reasonably be expected to know that his actions were unlawful"). Rodriguez moved for reconsideration of the Court's prior order. Following argument by the parties, and upon further reflection, the Court finds that neither issue merits reconsideration.

### A. *Municipal Liability of LISD*

The Supreme Court has held that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Board of County Commissioners of Bryan County v. Brown,* 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). Grounding § 1983 liability on the existence of an employer-employee relationship is inconsistent with the statute's language and legislative history. *Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A municipality's inaction constitutes a "policy," thereby exposing it to § 1983 liability, only in very limited circumstances.

A policymaker's inaction may constitute municipal policy when the policymaker is deliberately indifferent to the risk of clear constitutional violations. *See Bryan County,* 520 U.S. at 409–10, 117 S.Ct. 1382 (1997). The deliberate indifference test is extremely stringent. Not only must the violation of a federal right be "an obvious consequence of the policymakers' choice," *id.* at 409, 117 S.Ct. 1382, the "link" between the alleged inaction and the resulting harm must be "carefully test[ed]" by the court. *Id.* at 410, 117 S.Ct. 1382. LISD's decision not to take action on Rodriguez's grievance led to the obvious consequence of Rodriguez's reassignment. But no set of facts alleged in Rodriguez's Complaint, even if proven, establishes the necessary link to the specific harm of a constitutional violation. Because the only obvious consequence was that Rodriguez would be reassigned, she fails to state a claim of deliberate indifference on the part of LISD.

As an alternative ground for municipal liability, Rodriguez argues that LISD is responsible for Cruz's alleged retaliatory motive. This argument misses the mark: LISD is liable only if it delegated all of its authority to Cruz. The Supreme Court has held that a policymaker may not insulate itself from § 1983 liability "simply by delegating [its] policymaking authority to others." *City of St. Louis v. Praprotnik,* 485 U.S. 112, 126, 108 S.Ct. 915, 99 L.Ed.2d

107 (1988) (plurality). But the Court hastened to differentiate this theory from that of *respondeat superior:* "When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality." *Id.* at 127, 108 S.Ct. 915. In *Praprotnik,* the plaintiff alleged that his supervisors were angered by the plaintiff's 1980 administrative complaint, and that two years later, "new supervisors in a new administration" chose to transfer plaintiff elsewhere, ultimately leading to the plaintiff's layoff. *Id.* at 128, 108 S.Ct. 915. The Court held that, under these circumstances, the plaintiff failed to establish that his layoff resulted from a municipal policy. *Id.* at 128–29, 108 S.Ct. 915.

■ In the instant case, no set of facts alleged in Rodriguez's Complaint, even if proven, would establish that LISD adopted Cruz's alleged retaliatory motive by delegating all its authority to him. *Cf. Gattis v. Brice,* 136 F.3d 724, 727 (11th Cir.1998) (holding that a deputy's retaliatory motives for recommending an employee's demotion did not render the policymaker's decision to adopt the recommendation an unconstitutional policy, absent evidence that the policymaker knew of and adopted the deputy's improper motives). Rodriguez therefore fails to state a claim that LISD delegated its final decision-making authority to Cruz, and therefore subjected itself to § 1983 liability.

*B. Qualified Immunity of Cruz*

A complaint should be dismissed for failure to state a claim only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In considering a motion to dismiss under Rule 12(b)(6), the district court must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff. *Baker v. Putnal,* 75 F.3d 190 (5th Cir.1996). The court must also accept as true any reasonable inferences to be drawn from the plaintiff's allegations. *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061 (5th Cir. 1994).

■ In the procedural posture of a motion to dismiss, the instant case is close. To prevail, Rodriguez's pleadings, liberally construed in her favor, must show that her allegations to Cruz and to school board members clearly constituted protected speech in 1998. *See* 82 F.Supp.2d at 686. On the one hand, the Fifth Circuit's "mixed speech" decisions are replete with private grievances concerning issues of public concern. On the other hand, Rodriguez's allegations concerning possible testing improprieties and tracking into special education fall far short of all relevant precedents. Applying the "content, form, context" analysis, the Court continues to find that Rodriguez's case fails. According to the facts Rodriguez alleges: (1) she was acting pursuant to her job description, (2) the benefit of her reports did not clearly implicate the public interest, and (3) there was no public controversy.[9] Consequently, Rodriguez fails to allege that a reasonable person in 1998 would have known that her

---

**9.** Rodriguez's references to local news coverage of her reassignment are unavailing. *See* Complaint ¶ 4.108. The newspaper articles in question were published on November 10 and 12, 1998, more than a week after Rodriguez's reassignment. *See* LISD Exh. 66, Attachs.

B, C. For purposes of § 1983, a plaintiff cannot create a public controversy simply by reporting his or her termination or demotion to the local newspaper. Almost by definition, the public controversy must predate the allegedly wrongful termination or reassignment.

speech was protected by the First Amendment.

The correctness of the Court's February 2, 2000 holding is strengthened, not weakened by the Fifth Circuit's decision in *Kennedy v. Tangipahoa Parish Library*, 224 F.3d 359 (5th Cir.2000). In that case, a panel of the Fifth Circuit held that a public library employee stated a claim under § 1983 for being fired as a result of her criticism of the library management's response to the rape of a fellow employee. *Id.* at 375. *Kennedy* does not, of course, establish 1998 law for purposes of the instant action.[10] Nonetheless, the decision underscores the high standard for "public concern" necessary to establish the likelihood of a First Amendment violation in a mixed speech case. *Kennedy* can also be read to suggest that cases falling well short of its powerful factual circumstances may be dispensed with on a motion to dismiss.[11] This Court agrees, and therefore denies reconsideration concerning LISD's municipal liability and Cruz's qualified immunity.

## III. TEXAS WHISTLEBLOWER CLAIM AGAINST LISD

In considering a motion for summary judgment, the Court must construe the available evidence in the light most favorable to the non-movant. *See Byers v. Dallas Morning News*, 209 F.3d 419, 424 (5th

Cir.2000). The moving party is entitled to judgment as a matter of law only when the pleadings, depositions, interrogatories, and affidavits on file indicate no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-movant may not, however, rely solely on allegations in the pleadings. It must respond to the motion for summary judgment by setting forth particular facts indicating that there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). After the non-movant has been given the opportunity to raise a genuine factual issue, the Court may grant summary judgment only if no reasonable factfinder could find for the non-movant. *See Byers*, 209 F.3d at 423; *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548; Fed.R.Civ.P. 56(c).

The Court has already set forth one element of a Texas Whistleblower action essential to the instant case: "whether Rodriguez made a good faith report of [a violation of law]." 82 F.Supp.2d at 684 (citing Texas Govt. Code § 554.002). Evaluating the disputed evidence in the light most favorable to Rodriguez, the Court considers whether Rodriguez has raised a genuine issue of material fact concerning (1) a good faith report of a violation of law, and (2) the cause for her reassignment.[12]

---

**10.** *Kennedy* summarizes all the Fifth Circuit's "mixed speech" cases. *See* 224 F.3d at 367–72. Most of this summary concerns pre–1999 decisions. *See id.* at 367–71.

**11.** The result in *Kennedy* turned on several "critical concessions by appellees," including one that makes that case markedly different from the instant action: the library board admitted that the rape which sparked the plaintiff's letter "was a matter of public concern." 224 F.3d at 379.

**12.** Because the Court rules adversely to Rodriguez concerning the issues of good faith

report and causation, it need not address the much closer question of whether Rodriguez believed in good faith that LISD was authorized to regulate, enforce, or investigate alleged violations of TEA rules. The Court also assumes for purposes of this Order that Rodriguez's reassignment constitutes an "adverse personnel action." Tex Govt Code § 554.002(a) (Vernon 2001); *but see Serna v. City of San Antonio*, No. 99–50775, slip op. at 8 (5th Cir. Apr.9, 2001) (noting that in Whistleblower Act cases, "Texas courts have yet to set out under what circumstances a public

## A. Whether Rodriguez Made a Good Faith Report of a Violation of Law

■ For purposes of the Whistleblower Act, an employee makes a good faith report when he or she has both a subjective, and an objectively reasonable, belief that the reported conduct violates the law. In *Wichita County v. Hart,* 917 S.W.2d 779 (Tex.1996), the Texas Supreme Court created this two-pronged test for good faith. First, the employee must actually believe that the reported conduct violates the law. *Id.* at 784. Second, the employee's belief must be reasonable "in light of [his or her] training and experience." *Id.* Regarding the test's second prong, the Court held that an employer "takes a prohibited action" in violation of the Whistleblower Act "only if a reasonably prudent employee in similar circumstances would have believed that the facts as reported were a violation of law." *Id.* at 785.

In *Texas Department of Criminal Justice v. Terrell,* 18 S.W.3d 272 (Tex. Ct. App.—Tyler 2000, pet. denied), the Texas Court of Appeals demonstrated that groundless suspicions fail to satisfy the second prong of the good faith test. In that case, the plaintiff had a bachelor's degree in law enforcement and had been employed for 21 years at the Texas Department of Criminal Justice. In a 1991 meeting with the Department's Chairman of the Board, the plaintiff alleged that one of his superiors (1) traveled at state expense with a girlfriend, (2) formerly maintained a woman on the Department payroll solely because she was his girlfriend, (3) falsified payroll records, and (4) misappropriated travel funds. *Id.* at 274. When asked to provide support for the first allegation, the plaintiff admitted that he had no evidence, but stated that "every warden

in the system" knew of the relationship, and that the Board could therefore "check with any of them." *Id.* While the plaintiff's support for the second allegation was also "word of mouth," the plaintiff offered no support whatsoever for the third and fourth allegations. *Id.* Reversing a jury award for the plaintiff, the Court of Appeals held that a plaintiff does not act in good faith "when his report of a 'violation of law' is based entirely on unsubstantiated rumor and innuendo." *Id.* at 277.

### 1. Pacing Allegations

■ The Court notes that it is not obvious that pacing, standing alone, violates Texas law within the meaning of the Whistleblower Act.[13] A "law," for purposes of this Act, is (a) "a state or federal statute," (b) "an ordinance of a local governmental entity," or (c) "a rule adopted under a statute or ordinance." TEXAS GOVT. CODE § 554.001. The Texas Administrative Code identifies several examples of conduct violating TAAS security and confidentiality: duplicating secure materials, disclosing secure test contents, suggesting responses to secure test items, altering answers to secure test items, and assisting a student with an answer to a secure test item. 19 TEX. ADMIN. CODE § 104.1(c) (2000). Even though pacing is not specifically prohibited, the Administrative Code prohibits "any departure from the test administration procedures established by the commissioner of education." *Id.*

Pacing may violate the TEA's requirement that "each examinee ... be allowed to have as much time as necessary to respond to every test item." LISD Exh. 19 at 6 (original at 72); LISD Exh. 20 at

---

employee's transfer can be considered adverse").

**13.** Pacing, when accompanied by giving improper assistance, obviously violates Texas law. *See* 82 F.Supp.2d at 684 n. 6.

82 (original at 75). In support of her allegation that all pacing violates TAAS administration procedures, Rodriguez refers to a conversation she had on March 5, 1999, with Phyllis Kirkpatrick, of TEA's Division of Assessment. According to Rodriguez, Kirkpatrick informed her that pacing was not permitted. Rodriguez Dep. II at 41. But this answer is not dispositive. First, Rodriguez does not demonstrate that TEA considered pacing to be a TAAS violation in 1998. Second, Rodriguez presents no evidence concerning the factual context in which the TEA allegedly prohibits pacing. For example, did Kirkpatrick's answer relate to pacing alone, or to pacing accompanied with a teacher giving improper assistance?

■ Fortunately, the Court is spared the necessity of determining whether all pacing violates Texas law. Even if pacing by itself constitutes a violation of the law, Rodriguez must still raise a genuine issue of material fact that she made good faith reports to LISD concerning pacing. Construing the disputed evidence liberally in Rodriguez's favor, the Court concludes that Rodriguez did not make a good faith report of these alleged violations.

Rodriguez's summary judgment evidence, although satisfying the first prong of the good faith test, fails to raise a genuine issue of material fact that her report of alleged pacing incidents was reasonable in light of her training and experience. Rodriguez has neither firsthand nor secondhand knowledge that pacing ever occurred, or that pacing ever accompanied improper assistance.[14] According to her deposition testimony, Rodriguez received reports from principals that some teachers, or possibly "everyone," used pacing in the past. But Rodriguez has not introduced the statements or testimony of these

principals. Furthermore, Rodriguez did not depose Cynthia Conchas, to whom teachers allegedly reported a decline in TAAS scores due to the elimination of pacing. Rodriguez Dep. I. at 249. Rodriguez did depose Rosaura Rodriguez, but did not ask her whether two principals had inquired about pacing during the 1997–1998 school year. *Id.* at 257. Rodriguez's testimony is the only source of these alleged admissions.

Rodriguez's evidence regarding pacing accompanied by improper assistance is even less tenable. As an initial matter, Rodriguez's memorandum dated July 10, 1998 is not proper summary judgment evidence. The evidentiary problem becomes apparent by quoting her memorandum directly: "She [Artolozaga] proceeded to say that teachers at her school had commented that they worked the first two-three problems together with the students ...." LISD Exh. 88 at 1–2. In effect, Rodriguez records Artolozaga's statement about what others had told Artolozaga concerning a period about which Artolozaga has no actual knowledge. This memorandum is not simply hearsay or double hearsay; it is *triple* hearsay. Finding no possible exceptions governing (1) the alleged statements of others to Artolozaga, or (2) Artolozaga's alleged statement to Rodriguez, the Court finds that the July 10, 1998 memorandum is not proper summary judgment evidence. *See Pfau v. Reed*, 125 F.3d 927, 938 (5th Cir.1997) (rejecting as "inadmissible hearsay" a portion of the plaintiff's affidavit in which the plaintiff stated that fellow employees had told her about similar incidents of harassment by the same supervisor), *vacated on other grounds*, 525 U.S. 801, 119 S.Ct. 32, 142 L.Ed.2d 24 (1998). Accordingly, the Court gives no weight to

---

**14.** The Court does not require that Rodriguez have firsthand knowledge that pacing ever occurred at LISD schools: only teachers and students would be eyewitnesses to pacing.

the alleged facts recorded in Rodriguez's July 10, 1998 memorandum.

Even if Rodriguez's memorandum were admissible, it would still have little probative value. According to the memorandum, Artolozaga stated that "this was the first year that she was involved in the administration of the TAAS," and that "this year teachers had not paced." LISD Exh. 88 at 1. By the memorandum's plain meaning, Artolozaga had no firsthand knowledge of the alleged pacing and/or improper assistance. To the extent that Rodriguez's memorandum alleges Artolozaga's secondhand knowledge of improper assistance, this allegation is contradicted by other evidence. In a sworn statement executed in 1999, Artolozaga stated that her remark concerning "work[ing] the first two-three problems together with the students," LISD Exh. 88 at 1–2, was in regard to permissible breaks during testing. Apparently, Artolozaga's principal told the teachers to take "as many breaks as needed," and that teachers "could work on 2 or 3 problems and then take a break." LISD Exh. 73 at 3. Rodriguez admits that Artolozaga had no reason to lie in her sworn statement. Rodriguez Dep. II at 37.

Finally, the Court notes several problems undermining the probative value of Rodriguez's own deposition testimony regarding pacing. First, because her testimony concerns matters that teachers allegedly reported to Rosaura Rodriguez, Plaintiff Imelda Rodriguez's testimony constitutes inadmissible hearsay that does not fall within any exception. Second, Rodriguez agrees that evidence of cheating by a teacher would have led to a report to LISD's TAAS coordinator—and ultimately to TEA—and that she never made such a report. Rodriguez Dep. I at 214–15. Third, Rodriguez's testimony that two principals were interested in pacing, and that another principal admitted to using

pacing, contradicts the notes of quadrant meetings held in June 1998, at which she and the principals discussed past TAAS results and methods of improving performance. See LISD Exhs. 78, 102. The notes from these meetings never mention pacing or cheating, even though the two principals allegedly interested in pacing make numerous comments regarding the reasons for poor performance on the TAAS, and how LISD should improve scores. See LISD Exh. 102, at 5–9. Fourth, Rodriguez's deposition testimony fails to discuss how pacing was—or could be—used as a means of giving prohibited assistance. Although Rodriguez's Complaint discussed arrangements such as promises of candy, see Complaint ¶ 4.35, the affidavits and other evidence fail to support any such allegation.

Based on Rodriguez's failure to substantiate the thirdhand stories about pacing, the Court concludes that no reasonable administrator with Rodriguez's experience and training would rely on these rumors as the basis for a report of possible violations of the law. Like the plaintiff in *Terrell*, Rodriguez may not rely solely on rumors, or on what others may have said to third persons about pacing in prior years. As part of her job as assistant superintendent for curriculum and program accountability, Rodriguez could have gathered competent evidence about pacing, and she could have relied on this evidence in reporting possible violations of the law. That Rodriguez has failed to identify any such evidence is fatal to her action under the Whistleblower Act.

### 2. Improper Special Education Coding

Rodriguez also fails to raise a genuine issue of material fact that she made good faith reports to LISD concerning allegations of improper coding of special education students. For the 1996–1997 school

year, Rodriguez never made a report to anyone, and never clearly expressed that she thought there was a violation of law. Rodriguez's deposition testimony reveals, at most, a concern that too many students were placed in special education. Even crediting Rodriguez's testimony regarding her conversations with Elizondo and Trevino, *see* Rodriguez Dep. I at 68–81, not once did she then suggest that TEA or the LISD superintendent must be notified of a possible violation of the law.

■ Regarding coding in the 1997–1998 school year, Rodriguez's testimony unambiguously establishes that Frances Harrell, the director of special education, told Cruz at a 1998 meeting that students were being referred into special education solely to be exempted from TAAS testing. Rodriguez Dep. II at 81–82. Whether Harrell's oral statement counts as a report under the Whistleblower Act is an open question. But Rodriguez does not benefit from what Harrell said: Harrell, not Rodriguez, was responsible for special education. There is no evidence suggesting that Rodriguez herself made a report within the meaning of the Whistleblower Act. Simply adding a "me, too" to Harrell's possible report cannot qualify as a good faith report of a violation of the law.

### 3. Alleged Disclosure of Writing Prompt

Rodriguez raises a genuine issue of material fact that, in the spring of 1998, she made a good faith report to LISD concerning a fourth grade teacher's possible disclosure of a TAAS writing prompt. Because a teacher's advance knowledge of a secured writing prompt is a clearly defined violation of TEA regulations, a person in Rodriguez's position should report such allegations to an appropriate authority. In the instant case, Rodriguez informed LISD's then-superintendent Ramirez.

Rodriguez Dep. I. at 89. Upon Ramirez's advice, Rodriguez contacted Kazen. *Id.* at 90, 94–95. Kazen established the procedure for the subsequent investigation by Rodriguez, Luis Zapata, and Rosaura Rodriguez. *Id.* at 107–118, 145. Based on these facts, the Court finds that Rodriguez satisfies her burden of establishing that she made a good faith report of a violation of law solely with respect to the alleged disclosure of a TAAS prompt.

### B. Whether Rodriguez's Reassignment Was Caused by Her Alleged Good Faith Reports

■ The Texas Supreme Court has recently restated the rule that in Whistleblower Act cases, a jury may not infer causation without some evidence from the plaintiff that "an adverse employment action would not have been taken if the employee did not in good faith report illegal conduct." *City of Fort Worth v. Zimlich,* 29 S.W.3d 62, 68 (Tex.2000) (citing *Department of Human Servs. v. Hinds,* 904 S.W.2d 629, 633 (Tex.1995)). Applied to the instant factual circumstances, Rodriguez's complaint, together with her supporting affidavits and evidence, must raise a genuine issue that she was reassigned as a result of her reporting violations of law concerning pacing, special education coding, and the improper disclosure of a testing prompt. As to each possible ground for adverse personnel action, the evidence supporting causation is nonexistent.

Concerning pacing, Rodriguez acknowledges that Cruz showed no displeasure with her allegations. Rodriguez Dep. I at 250. Admittedly, Cruz could have harbored a secret resentment because of the pacing allegations. But why, then, would Cruz write a five-point memorandum announcing the reasons for Rodriguez's reassignment, without mentioning the pacing allegations? The Court may of course con-

sider circumstantial evidence, *see Zimlich,* 29 S.W.3d at 69,[15] but the plaintiff must show that such evidence can establish causation. Rodriguez does not suggest that the points discussed in Cruz's November 4, 1998 memorandum were pretextual: she simply disagrees now—as she did in 1998—with his analysis. Rodriguez Dep. I at 233–46. Rodriguez similarly fails to support her assertion that anyone at LISD, including Cruz, Jordan and Kazen, was upset about the pacing allegations. *Id.* at 262–63.

The issue of improper coding of special education students is somewhat more complex. As an initial matter, Rodriguez puts forth no evidence that her 1997 conversations with Elizondo and Trevino reached Cruz's attention a year-and-a-half-later. *See supra* Section I.B. In 1998, according to her deposition testimony, Rodriguez again made no report, but simply restated Harrell's conclusion that principals were improperly exempting students from TAAS. Cruz subsequently directed Rodriguez to advise principals on how properly to code students for special education. Based on her professional judgment, Rodriguez awaited guidance from TEA before producing a document for the principals. The record does not reveal whether Rodriguez asked Cruz for more time in preparing this document. But when Cruz was informed that the document had not been prepared, he based his decision to reassign Rodriguez, in part, on her failure to follow his orders.

Certainly there is a link between Rodriguez's failure to prepare the special education document and her reassignment. But for purposes of the instant action, the legally relevant link is between (1) Rodriguez's alleged report of illegal activity and (2) her reassignment. The evidence reveals that Cruz and the principals were confused about whether students were being improperly coded at all. No one—including Rodriguez and Harrell—suggested in the these meetings that LISD was violating TEA rules. Therefore it is a *non sequitur* for Rodriguez to claim that her reassignment flowed from any report of a violation of law. The undisputed evidence establishes that, in 1998, Cruz was concerned with modifying present practices, not investigating past problems, of special education coding.

Regarding the alleged disclosure of the TAAS writing prompt, Rodriguez puts forth no evidence that Cruz was ever aware of the investigation, much less that he reassigned her as a result. As Rodriguez acknowledges, the interviews with the fourth grade teacher and others took place in Spring 1998, months before Cruz became superintendent. No conclusion was made that the teacher violated TEA rules, and no report was submitted to TEA. Rodriguez Dep. at 149–50. Further, no one discussed this investigation with Cruz. *See supra* Section I.D.1. Rodriguez has wholly failed to meet the burden of setting forth

**15.** The Texas Supreme Court has identified the following examples of circumstantial evidence that may "establish a causal link between" a report of illegal activity and an adverse employment action: "(1) knowledge of the report of illegal conduct, (2) expression of a negative attitude toward the employee's report of the conduct, (3) failure to adhere to established company policies regarding employment decisions, (4) discriminatory treatment in comparison to similarly situated employees, and (5) evidence that the stated reason for the employment action was false." *Zimlich,* 29 S.W.3d at 69 (citing *Continental Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 451 (Tex.1996)). Although Rodriguez's Complaint generally alleges incidents fitting within these categories, her deposition testimony, discovery responses, and affidavits fail to "set forth *particular facts* showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e) (emphasis added).

particular facts indicating a genuine jury issue concerning causation.

Finally, Rodriguez's evidence regarding allegedly discriminatory treatment by Cruz is insufficient to survive summary judgment. According to Rodriguez, Cruz promoted people with whom Rodriguez did not get along, and did not allow her to attend a professional conference. Rodriguez not only fails to provide a context for this allegedly discriminatory treatment, but also fails to support her allegations with deposition testimony and discovery responses. Rodriguez's Declaration is actually more vague and conclusory than her Complaint. *Compare* Complaint ¶¶ 4.86–4.90, *with* Rodriguez Decl. at 4. Standing alone, these decontextualized, unsubstantiated assertions of negative treatment cannot raise a genuine issue of material fact concerning causation.

## IV. CONCLUSION

Because Rodriguez has failed to allege facts upon which LISD can be liable for her reassignment, and upon which Cruz violated clearly established law by reassigning her, the Court **DENIES** her Motion for Reconsideration of the February 2, 2000 Order dismissing the § 1983 claims. Further, because the pleadings, affidavits, and supporting materials fail to raise a genuine issue (1) that Rodriguez made a good faith report of a violation of law (except with regard to the alleged disclosure of the TAAS writing prompt) and (2) that Rodriguez was reassigned as a result of her reports of illegal activities, the Court **GRANTS** Defendants' Motion for Summary Judgment and dismisses all remaining claims.

IT IS SO ORDERED.